**2017-1643**

# In The
# United States Court Of Appeals
## For The Federal Circuit

## SEH AHN LEE, IRINA RYAN,
## AHMAD NARIMAN, MARK PEACH,

*Plaintiffs-Appellants,*

v.

## UNITED STATES,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES COURT OF FEDERAL CLAIMS
CASE NO. 1:15-CV-01555-CFL -

---

## BRIEF OF APPELLANTS

---

**John P. Pierce**
**David L. Engelhardt**
**Michael P. Cone**
THEMIS, PLLC
**2305 Calvert Street, NW**
**Washington, DC  20008**
**(202) 567-2050**

*Counsel for Appellants*

FORM 9.  Certificate of Interest

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Lee et al      **v.**      United States

Case No.      17-1643

## CERTIFICATE OF INTEREST

Counsel for the:

☐ (petitioner) ☒ (appellant) ☐ (respondent) ☐ (appellee) ☐ (amicus) ☐ (name of party)

John Pierce

certifies the following (use "None" if applicable; use extra sheets if necessary):

| 1. Full Name of Party Represented by me | 2. Name of Real Party in interest (Please only include any real party in interest NOT identified in Question 3) represented by me is: | 3. Parent corporations and publicly held companies that own 10 % or more of stock in the party |
|---|---|---|
| Seh Ahn Lee | None | None |
| Irina Ryan | None | None |
| Ahmad Nariman | None | None |
| Mark Peach | None | None |
| | | |
| | | |
| | | |

4.   The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court (**and who have not or will not enter an appearance in this case**) are:

All partners, associates, and law firms have appeared or are expected to appear in this appeal.

Jun 12, 2017
_____
Date

_____
Signature of counsel

Please Note: All questions must be answered

John Pierce
_____
Printed name of counsel

cc: _____

Reset Fields

# TABLE OF CONTENTS

**Page:**

TABLE OF AUTHORITIES .................................................................iv

STATEMENT OF RELATED CASES ...................................................ix

STATEMENT OF JURISDICTION.......................................................1

STATEMENT OF THE ISSUES...........................................................1

STATEMENT OF CASE ......................................................................1

    I.     STATEMENT OF FACTS...................................................2

          A.    Preliminary Statement.................................................2

          B.    The Strict Prohibition on Contracting for Personal Services ....................................................................4

          C.    The Contracts' False Scopes of Work ........................5

          D.    Appellants Provided Out-of-Scope Personal Services ..............9

          E.    The Agency's Knowledge of its Unlawful Contracts and their False Scopes...................................................11

               1.    The IRS .........................................................12

               2.    The United States District Court ....................13

               3.    The IRS, Again .............................................13

               4.    The Inspector General .................................15

F.      Proceedings on the First Amended Complaint .........................18

G.      Proceedings on the Proposed Second Amended
        Complaint ...................................................................................20

SUMMARY OF ARGUMENT ..........................................................................21

ARGUMENT ......................................................................................................24

I.      Standard of Review .........................................................................24

II.     The Trial Court's Dismissal of Count II of the FAC Was
        Reversible Error ..............................................................................26

        A.      It Was Error to Dismiss the Claim for Breach of Express
                Contract ...................................................................................27

        B.      It Was Error to Dismiss the Claims for Breach of Implied
                Contract and Quantum Meruit ................................................30

                1.      The Contracts' Invalidity ................................................30

                2.      Implied Terms for Fair Compensation ...........................32

                3.      Quantum Meruit ...............................................................34

III.    The Trial Court Erroneously Denied Leave to Amend ......................37

        A.      The Supreme Court "Mandate[s]" That Post-Judgment
                Leave "Shall Be Freely Given" ...............................................38

        B.      The Proposed Amendments Are Not Futile ..............................38

                1.      Count II of the SAC Is Not Futile ..................................39

                2.      Proposed Counts III and IV are not Futile ......................43

        C.      The Further Requirements Of Rule 59 Are Not
                Applicable .................................................................................47

CONCLUSION ...................................................................................................48

CERTIFICATE OF FILING AND SERVICE

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Page(s):**

## Cases

*Adarbe v. United States,*
  58 Fed. Cl. 707 (2003)........................................................................30

*Ajinomoto Co. v. Archer-Daniels-Midland Co.,*
  228 F.3d 1338 (Fed. Cir. 2000) .........................................................25

*Allied Materials & Equip. Co. v. United States,*
  569 F.2d 562 (Ct. Cl. 1978)........................................................ 29, 40

*Almutairi v. International Broad. Bureau,*
  928 F. Supp. 2d 219 (D.D.C. 2013) ...................................... 10, 13, 16

*American Telephone and Telegraph Company v. United States,*
  177 F.3d 1368 (Fed. Cir. 1999)................................................ 35, 36, 37

*Anchor Tank Lines, LLC v. United States,*
  127 Fed. Cl. 484 (2016).....................................................................30

*Aragona Constr. Co. v. United States,*
  165 Ct. Cl. 382 (1964)......................................................................29

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ................................................................. *passim*

*Atlas Corp. v. United States,*
  895 F.2d 745 (Fed. Cir. 1990) ..........................................................33

*Barrett Ref. Corp. v. United States,*
  242 F.3d 1055 (Fed. Cir. 2001) ................................................. *passim*

*Barrett Ref. Corp. v. United States,*
  42 Fed. Cl. 128 (1998)......................................................................32

*Barrett Ref. Corp. v. United States*,
   45 Fed. Cl. 166 (1999) ........................................................................32

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ............................................................ 25, 34, 39

*Cambridge v. United States*,
   558 F.3d 1331 (Fed. Cir. 2009) ........................................... 24, 26, 39

*Cities Service Gas Co. v. United States*,
   500 F.2d 448, 205 Ct. Cl. 16 (1974).....................................................35

*City of Cincinnati v. United States*,
   153 F.3d 1375 (Fed. Cir. 1998) .........................................................30

*Enron Fed. Solutions, Inc. v. United States*,
   80 Fed. Cl. 382 (2008).......................................................................28

*Foman v. Davis*,
   371 U.S. 178 (1962) ................................................................. *passim*

*General Dynamics Corp. v. United States*,
   218 Ct. Cl. 40 (1978).........................................................................29

*Gould, Inc. v. United States*,
   935 F.2d 1271 (Fed. Cir. 1991) ..................................................... 24, 26

*Greenlee Cty., Ariz. v. United States*,
   487 F.3d 871 (Fed. Cir. 2007) ...................................................... 23, 24

*Lee v. United States*,
   127 Fed. Cl. 734 (2016).......................................................................2

*Lee v. United States*,
   130 Fed. Cl. 243 (2017).......................................................................2

*Miller Elevator Co. v. United States*,
   30 Fed. Cl. 662, *dismissed,* 36 F.3d 1111 (Fed. Cir. 1994).......................... 29, 40

v

*NASCENT Grp., J.V. ex rel. Native Am. Servs. Corp. v. United States*,
    103 Fed. Cl. 338 (2012)......................................................................28

*Papasan v. Allain*,
    478 U.S. 265 (1986) ............................................................... 24, 26

*PCL Const. Servs., Inc. v. United States*,
    47 Fed. Cl. 745 (2000)............................................................ 29, 40

*Potter v. United States*,
    424 F. App'x 941 (Fed. Cir. 2011) ....................................................24

*Sanofi-Aventis v. Apotex Inc.*,
    659 F.3d 1171 (Fed. Cir. 2011) .............................................. 24, 25

*Southfork Sys., Inc. v. United States*,
    141 F.3d 1124 (Fed.Cir.1998) .........................................................23

*Spiegel v. Schulmann*,
    604 F.3d 72 (2d Cir.2010) ..............................................................25

*Taylor v. United States*,
    303 F.3d 1357 (Fed. Cir. 2002) ......................................................24

*United Pac. Ins. Co. v. United States*,
    68 Fed. Cl. 152 (2005)....................................................................36

*United States v. Amdahl Corp.*,
    786 F.2d 387 (Fed. Cir. 1986) ..................................... 23, 33, 35, 43

*United States v. North Am. Transp. & Trading Co.*,
    253 U.S. 330 (1920) .......................................................................35

*Urban Data Systems, Inc, v. United States*,
    699 F.2d 1147 (Fed. Cir. 1983) ......................................................35

*W. Bay Builders, Inc. v. United States*,
    85 Fed. Cl. 1 (2008) .............................................................................28

*Walls v. United States*,
    582 F.3d 1358 (Fed. Cir. 2009) .........................................................24

## Statutes

26 U.S.C. § 3121(d)(2) ............................................................................28

28 U.S.C. § 1295(a)(3) ..............................................................................1

28 U.S.C. § 1491(a)(1) ..............................................................................1

## Regulations

5 C.F.R. § 304.104(b)(3) .........................................................................32

26 C.F.R. § 31.312(d) ..............................................................................28

26 C.F.R. § 31.340(c) ..............................................................................28

48 C.F.R. § 2.101 .....................................................................................28

48 C.F.R. § 37.101 .....................................................................................6

48 C.F.R. § 37.104 ...................................................................................42

48 C.F.R. § 37.104(a) ..............................................................................30

48 C.F.R. § 37.104(b) ................................................................... 4, 31, 45

48 C.F.R. § 37.104(c) ............................................................................6, 7

48 C.F.R. § 37.104(d) ..........................................................................6, 28

**Rules**

Ct. Fed. Cl. R. 15 ............................................................................ *passim*

Ct. Fed. Cl. R. 15(a) ....................................................................... *passim*

Ct. Fed. Cl. R. 15(a)(1) ...........................................................................1

Ct. Fed. Cl. R. 15(a)(2) .........................................................................38

Ct. Fed. Cl. R. 59 ................................................................. 21, 24, 38, 47

Ct. Fed. Cl. R. 59(e) ....................................................................... *passim*

Ct. Fed. Cl. R. 60 ....................................................................................2

Fed. R. Civ. P. 12(b)(1) ................................................................. 23, 24

Fed. R. Civ. P. 12(b)(6) ................................................................. 23, 24

**Additional Authorities**

Black's Law Dictionary 693 (5th ed. 1979) ...........................................28

*http://thelawdictionary.org/independent-contractor/* .............................5

Pub. L. 107-228, Div. A, Title V, § 504, Sept. 30, 2002, 116 Stat. 1393 ...... 4-5, 31

## STATEMENT OF RELATED CASES

Pursuant to Rule 47.5, Appellants' counsel is unaware of any other related cases pending in this or any other court that will directly affect or be directly affected by this court's decision in the pending appeal.

## STATEMENT OF JURISDICTION

The United States Court of Federal Claims has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1491(a)(1).

The United States Court of Appeals for the Federal Circuit has jurisdiction over this appeal pursuant to 28 U.S.C. § 1295(a)(3).

This appeal is timely. The trial court's judgment was entered on August 25, 2016. Appellants filed post-judgment motions on September 22, 2016, tolling the 60-day filing period. The trial court issued its ruling on the post-judgment motions on January 18, 2017, and Appellants filed their timely notice of appeal on February 15, 2017.

## STATEMENT OF THE ISSUES

I. **Whether the trial court was in error when it dismissed Appellants' claims for breach of express contract, breach of implied contract, and *quantum meruit*, when the Agency acquired personal services from Appellants under contracts that were admittedly issued in violation of law and falsely scoped for "non-personal services."**

II. **Whether the trial court was in error when it ruled that proposed, post-judgment amendments to the complaint were futile under Ct. Fed. Cl. R. 15(a) and not compliant with Ct. Fed. Cl. R. 59(e).**

## STATEMENT OF CASE

Appellants filed their complaint on December 21, 2015 and their First Amended Complaint ("FAC") on March 7, 2016 pursuant to Rule 15(a)(1). In lieu of filing an answer, the government filed a motion to dismiss on April 28, 2016.

Following briefing, the trial court heard the motions on August 16, 2016. The court ordered supplemental briefing from the government, which was filed on August 18, 2016. Appellants filed their response to the government's supplemental briefing on August 23, 2016. On August 24, 2016, the trial court issued its order dismissing the Appellants' FAC, which can be found at *Lee v. United States*, 127 Fed. Cl. 734 (2016). On August 25, 2016, the trial court issued its judgment dismissing the case.

On September 22, 2016, Appellants timely filed concurrent motions for reconsideration and leave to file their Second Amended Complaint ("SAC"). Following briefing, the trial court heard the Appellants' motions on December 15, 2016. On January 18, 2017, the trial court issued its order denying the Appellants' motions for reconsideration and leave to file its SAC. The order can be found at *Lee v. United States*, 130 Fed. Cl. 243 (2017). This appeal follows.

## I.     STATEMENT OF FACTS

### A.     *Preliminary Statement*

Government agencies are strictly prohibited from issuing contracts for the acquisition of personal services, except as specifically authorized by Congress. Without specific authorization, agencies must acquire personal services from employees in the federal service. Here, the Board of Broadcasting Governors (the "Agency") lacked the required authorization to contract with Appellants and other

2

providers of personal services, but wished to avoid the costs of employment, and so it knowingly issued prohibited contracts to up to 2,000 different contractors at various times since 2003.

In a crude effort to evade the law, the Agency falsely labeled the contracts for "***non***-personal services," falsely gave Appellants and others the title of "independent contractor," and wrote the contracts for a level of service that did not match, ***or compensate***, the work that it was extracting. By falsifying the contracts' scopes of work, the Agency managed to conceal its unlawful acquisitions for a decade; but ***by design***, the Agency was contracting and paying for one type of service, while forcing Appellants to provide a far more valuable service, in blatant breach of contract.

Appellants' allegations track a report issued by the Agency's Inspector General in 2014, following an audit in 2013. The Inspector General found that the "overwhelming majority" of the Agency's 660 then outstanding "independent contracts" for "non-personal services" were being administered to acquire personal services in violation of law. Appx153, Appx157, Appx158. The four Appellants were among the "overwhelming majority." Appx81-82, Appx888-889, Appx893, Appx903, Appx153, Appx157, Appx158. They brought alternative claims for breach of express contract, breach of implied contract, and *quantum meruit*. A proposed class would bring the same claims. Appx94, Appx902.

3

As admitted by the Agency after getting caught by the Inspector General, the Agency used contracts that falsely specified the acquisition of non-personal services to obtain personal services in violation of law and at lower cost. In the trial court's own words, the contracts compensated Appellants for providing non-personal services, but the Agency demanded and received personal services, which were more than it bargained for. That is a claim for breach, and it is plain on the face of the court's opinion. But the court literally overlooked the claim upon dismissing the FAC, and then misconstrued the contracts' scopes of work upon rejecting the proposed SAC.

The court also erred in rejecting the claims for implied contract and *quantum meruit*. It misapplied the rule that courts cannot imply terms that are ***related*** to a ***valid*** contract. These contracts are ***not valid***; the law prohibits their very existence. Following their invalidation, the trial court is required to grant relief by implied terms or in *quantum merit*. The implied terms would concern Appellants' personal services, which are ***not related*** to the contracts' falsified terms for non-personal services.

## B.    *The Strict Prohibition on Contracting for Personal Services*

Under the Federal Acquisition Regulations ("FAR"), "[a]gencies ***shall not*** award personal services contracts unless ***specifically*** authorized by statute . . . ." 48 C.F.R. § 37.104(b) (emphasis added). A statute specifically authorized this Agency to use no more than ***60*** personal services contracts at any one time. Pub. L. 107-

4

228, Div. A, Title V, § 504, Sept. 30, 2002, 116 Stat. 1393 (emphasis added). In fact, the Agency was obtaining personal services under *660* contracts at all relevant times. It falsely labeled and wrote the contracts' scopes of work for non-personal services to evade the prohibition and conceal the violation. Appx69, Appx82, Appx84, Appx90, Appx94, Appx875, Appx888-889, Appx891, Appx897-898, Appx902. Appellants' allege that the Agency obtained their personal services in breach of their contracts' express terms, and in the alternative, that the contracts are voidable for their inherent illegalities. Appx69-70, Appx79, Appx84, Appx874-876, Appx881, Appx884, Appx886, Appx891, Appx897.

### C.    *The Contracts' False Scopes of Work*

Each of Appellants' contracts stipulated that "[i]t is . . . understood and agreed that the Contractor . . . shall perform the services specified herein as independent contractors . . . ." Appx1215, Appx1044, Appx1870, Appx690. An "independent contractor" is a "person who is asked [t]o perform an action or job [and] who maintains . . . control over the job."[1] According to a standard provision in Appellants' contracts[2]:

---

[1] http://thelawdictionary.org/independent-contractor/

[2] Plaintiff Nariman did not possess a copy of his contracts at the time of filing of this lawsuit. The Agency attached copies of some of his contracts to its opposition to motion to certify. The same contractual language quoted above and throughout this brief appears in contracts for every plaintiff.

> This . . . is a ***"nonpersonal services contract" as that term is defined in the Federal Acquisition Regulation at Subpart 37.101.*** . . . Contractor[s] . . . (1) Shall perform the services . . . ***as independent contractors, not as employees*** of the Government; (2) Shall be ***responsible for their own management and administration*** of the work required[;] . . . (3) Shall be ***free from supervision or control by any Government employee*** with respect to the manner or method of performance of the services specified; but (4) Shall, pursuant to the Government's right and obligation to inspect, accept, or reject the work, comply with such general direction of the Contracting Office[] . . . as is necessary to ensure accomplishment of the contract objective.

Appx1215, Appx1044, Appx1870, Appx690 (emphasis added).

Under the incorporated provision of the FAR, "Nonpersonal services contract means a contract under which the personnel rendering the services are ***not subject*** . . . ***by the manner of its administration . . . to the supervision and control*** usually prevailing in relationships between the Government and its employees." 48 C.F.R. § 37.101 (emphasis added.) The FAR elsewhere imposes limits on the services of independent contractors. As relevant here, those limits are:

- no provision of personal services;
- no direct and continuous federal supervision;
- no work equal to that of a federal employee;
- no expectation of service beyond one year; and
- no provision of services that are integral to a governmental interest.

48 C.F.R. § 37.104(d). Appx77, Appx883-884.

Under 48 C.F.R. § 37.104(c), to determine whether a contract is genuinely independent and for non-personal services, the "arrangement must be judged in the

6

light of its own facts and circumstances, the ***key question always being***: Will the Government exercise relatively continuous ***supervision*** and control over the contractor . . . ?" 48 C.F.R. § 37.104(c) (emphasis added). Working under federal supervision converts an independent contractor to a provider of personal services, and in effect to an employee. Appx77, Appx81, Appx883, Appx888, Appx160.

The contracts further provide that "[t]he Government and the Contractor understand and agree that the services . . . are ***non-personal*** . . . and . . . that ***no employer-employee relationship*** . . . will exist . . . ." And, once again, "Contractor personnel . . . shall not [b]e placed . . . under the supervision, direction, or evaluation of a Government employee . . . [nor b]e used in administration or supervision of Government procurement activities." Appx1215, Appx1044, Appx1870, Appx690 (emphasis added).

It was crucial to the Agency to maintain the false appearance of independent contracting for non-personal services, because the Agency knew that it was using the contracts to acquire out-of-scope personal services in violation of law. The contracts thus provided that Appellants "shall not . . . misrepresent[] the character of the independent contractual relationship. . . . A violation of this paragraph may subject the Contractor to an immediate 'Termination for Cause.'" Appx1211, Appx1046, Appx1867, Appx693. Appellants worked under threat of being fired if they truthfully described their services to persons outside the Agency. "Feeling

among contractors [is] that they cannot ask questions about their contracts, for fear of [being] terminated . . . [they] are on a slippery slope if they complain knowing that if they do, their services could be ended at any time and with no justification and no recourse." Appx124.

The contracts also incorporate standard provisions for change orders within their general scopes. Appx1215, Appx1011, Appx1870, Appx690. For such changes, additional compensation is due by negotiated adjustment to the contract price. Appx1215, Appx1044, Appx1870, Appx690. As shown below, the changes here were beyond the general scopes and in breach of contract, giving rise to claims for damages. Appx70-71, Appx89, Appx100, Appx876-877, Appx885, Appx898-899.

Finally, the contracts set Appellants' compensation in accordance with the falsified scopes of work. Because the contracts supposedly do "not create an employer-employee relationship . . . ***entitlements and benefits applicable to such relationships do not apply***. Payments by the Government under this contract are not . . . subject to the Federal Insurance Contributions Act. . . . The Contractor is not entitled to unemployment compensation benefits [or] workman's compensation benefits . . . ." Appx1215, Appx1044-1045, Appx1871, Appx691 (emphasis added).

8

By the Agency's own estimate, Appellants' annual compensation was $20,000 to $30,000 lower than the compensation paid to providers of similar services under lawful arrangements, such as term appointments to federal employment. Appx69, Appx88-89, Appx96, Appx99-100, Appx875-876, Appx896-897, Appx904. The under-compensation includes wages, benefits, and employer contributions to payroll taxes. Appx70-71, Appx78, Appx88-91, Appx93, Appx96, Appx98, Appx876-878, Appx884, Appx896, Appx898-899, Appx901, Appx904.

### D.    Appellants Provided Out-of-Scope Personal Services

Appellants did not serve as independent contractors for non-personal services, as specified in their scopes of work, but worked in employment relationships and provided personal services. Appx68-70, Appx79, Appx81-83, Appx90, Appx98, Appx100, Appx875-877, Appx882-883, Appx886-888, Appx896, Appx897-898. They worked under continuous and direct federal supervision, and provided services that were identical to those of federal employees and integral to the governmental mission. More than 100 contractors explained their similar circumstances in a letter to then Chairman Shell. The "[c]ontractors . . . do[] the same jobs with the same job titles at the same times in the same ways with the same supervision," without receiving the same compensation. Appx301. The President of the American Federation of Government

9

Employees, Local 1812, raised the same points in a meeting of the BBG's Governance Committee. Appx283.

Appellants showed below that "[t]hey work alongside [federal employees]. They report to the same supervisor. They do the same services." Appx765-768, Appx774, Appx2192, Appx 301, Appx 283. Such allegations are found throughout the pleadings. Appx81-83, Appx87-88, Appx98, Appx887-890, Appx894-895, Appx907. More than 180 contractors have agreed to opt into the proposed class, if certified. As explained at the hearing, "All of th[em] have filled out a survey . . . [to] confirm[] . . . federal supervision . . . ." Appx765, Appx357, Appx370.

These allegations are well supported. The Inspector General found that the Agency exercised relatively continuous supervision and control over virtually all contractors, and had contractors serving inherently governmental functions. Appx153-154, Appx159-160, Appx197-199, Appx222. A U.S. District Court and the IRS have made similar findings with respect to individual contractors. *Almutairi v. Int'l Broad. Bureau*, 928 F. Supp. 2d 219 (D.D.C. 2013); *see also* Appx157, Appx270, Appx2074-2076. Appellants re-alleged the facts that supported those prior findings with respect to themselves. Appx77, Appx82-83, Appx86-90, Appx883, Appx889-890, Appx893-895, Appx897, Appx907.

Appellants' out of scope work under prohibited contracts was not incidental. It was programmatic. The Agency's liabilities are the necessary result of making

10

up to 2,000 prohibited acquisitions of personal services under cover of mis-labeled and falsely scoped contracts. The Agency began the programmatic lawlessness in 2003, immediately upon receiving Congressional authorization to use not more than *60* contracts for personal services in lieu of federal employment. At all times since 2003, the Agency has been obtaining personal services under approximately *660* contracts at a time. At least 600 of them have been unlawful. Appx69, Appx82, Appx84, Appx90, Appx104, Appx875-876, Appx888-889, Appx891, Appx897-898, Appx902.

### E.    *The Agency's Knowledge of its Unlawful Contracts and their False Scopes*

Contracting officers and the Senior Procurement Executive of the Agency admitted to knowing that they were making unlawful acquisitions of personal services under contracts that were falsely scoped for non-personal services. Appx68, Appx83-84, Appx96, Appx874, Appx890-891, Appx903-904, Appx151, Appx179-180. They knowingly issued unlawful contracts for many years because they felt "pressure" from their superiors. Appx82-84, Appx889-890, Appx151, Appx179-181. The Agency's top leadership learned of the unlawful contracting no later than 2010, but consciously chose to proceed in violation of law, until caught by the Inspector General in 2014. During that period, the IRS, a federal court, the IRS again, and finally the Inspector General found that supposedly independent contractors were providing personal services, entitling them to compensations of

11

employment. The Agency's leadership reviewed these decisions, acknowledged their validity, and even ***estimated the accruing liabilities***.

### 1. The IRS

The first ruling from the IRS concerned Appellant Mark Peach. He challenged his obligation to pay the employer's share of his payroll taxes, as unlawfully required in the falsified terms of his contracts. As explained by the Inspector General, "The IRS undertook a 2010 tax audit of BBG's use of [contractors] and concluded that [the Agency] ***should have treated [them] as employees*** for tax reporting purposes, including by withholding income and Social Security taxes . . . ." Appx86, Appx893, Appx270 (emphasis added). The IRS decided that "the [A]gency exercised or had the right to exercise such ***control over the workers*** . . . as was necessary . . . ***to establish the relationship of employer and employee***." Appx86, Appx893, Appx157 (emphasis added). The IRS advised Peach that the Agency "retained the right to exercise direction and control over the services you performed . . . . [I]t appears that ***you were an employee for the purpose of the FICA***," leaving the Agency liable for the employer's share of his payroll taxes. Appx2074-2076 (emphasis added).

The Agency's leadership summarized the ruling in similar terms in an internal memorandum, with no indication of a challenge to the IRS's conclusion. Appx86, Appx893, Appx270. The Agency has defied the ruling, however, and still

12

refuses to pay its share of Peach's payroll taxes. Appx86, Appx893, Appx766. In this action, every Appellant seeks to recover the Agency's share of payroll taxes.

### 2.    *The United States District Court*

A federal court held in March 2013 that the nature of an applicant's prospective service to the Agency, under a contract of the type at issue, was to be "personal." Accordingly, he had standing as an applicant for "employment" under the discrimination statutes. *Almutairi*, 928 F. Supp. 2d 219; *see also* Appx86, Appx894.

### 3.    *The IRS, Again*

In November 2013, the IRS ruled against the Agency in yet another proceeding. As summarized by the Inspector General, the IRS found that the Agency "exercised or had the right to exercise such control over the [contractors] . . . as was necessary . . . to establish the relationship of employer and employee." The IRS again concluded that the Agency should treat supposed contractors as employees for tax purposes. Appx86, Appx893, Appx157.

Following this decision, ***the Agency anticipated its present liability for a share of payroll taxes***. In the Agency's words, "The IRS issued a 'notice of proposed adjustment' in 2013, concluding that [this Agency] should have treated [contractors] as employees, rather than independent contractors, for tax purposes . . . . [We] may be liable for employment taxes relating to [contractor]

13

payments dating back to 2010." Appx2138. "[O]ur current strategy of using *hundreds of contracts* with individuals to meet these needs creates *significant liabilities* for the Agency and equity issues for the contractors." Appx85, Appx892, Appx264 (emphasis added). The Agency further admitted that the more openly "we treat contractors like federal employees," in accordance with their actual service, "the greater the chance we will have to withhold and pay taxes as if they are employees, and that *they can claim rights to . . . federal employee benefits* such as health insurance." Appx68, Appx874-875, Appx264 (emphasis added). The Agency concluded that "[p]otential liabilities may arise from the possible establishment of an 'employer-employee' relationship between the Agency and each individual contractor." Appx68, Appx875, Appx268.

The Agency examined alternatives to using the prohibited contracts. It found that it *"has the authority to hire employees* on a term appointment basis for up to 4 years," but at additional cost. Appx69, Appx875-876, Appx266 (emphasis added). Given the cost of the lawful alternative, the Agency's leadership chose to break the law and save the difference:

> Employees on term appointments receive all of the benefits of federal employment . . . . In most cases, equivalent employees cost the Agency significantly more than contractors, even in base salary. Add federal employee benefits to that, and this becomes an *effective but expensive solution* -- estimates tend toward 30-50% additional cost per person or $12M-$18M annually.

14

Appx69, Appx875-876, Appx266 (emphasis added). That comes to $20,000 to

$30,000 per contractor per year. Appx69, Appx875-876.

### 4.    *The Inspector General*

The Inspector General found that the Agency "routinely" entered contracts

for personal services in excess of the Congressional authorization, and that the

"overwhelming majority" of the 660 outstanding "independent contracts" were

being administered for prohibited acquisitions of personal services. Appx82,

Appx888-889, Appx157. As noted, the Inspector General's conclusion was

supported by evidence of continuous federal supervision, service in the manner of

federal employees, and service to inherently governmental functions. Appx151,

Appx154, Appx156-157, Appx159-160, Appx191, Appx195, Appx197-199,

Appx218, Appx222.

Neither the Inspector General nor the Agency could identify **even one**

supposedly "independent" contract for "non-personal" services that was truthfully

written; it appears that **every** such contract falsified the scopes of work and other

terms. Appx81-82, Appx888. The Inspector General found **"ultimately that . . .**

**employee/employer relationship[s] existed"** and the contractors **"should have**

**been full-time employees."** Appx81-83, Appx887-890, Appx156 (emphasis

added). An Agency official admitted to the Inspector General that the Agency

consciously used contractors to fill full-time employee positions, **even after the**

*practice was identified as a problem.* Appx89, Appx96, Appx897, Appx903-904, Appx156-157.

The Agency's first official response to the Inspector General was to complain of the law's inconvenience, with citation to an article that questioned the violated prohibition's utility, *but not its applicability*. Appx119, Appx239. Ultimately, the Agency "concur[red] that it *cannot* employ personal service contractors in excess of those authorized." Appx85-86, Appx892, Appx245 (emphasis added). The Agency again acknowledged that it was accruing liabilities, and finally decided to change its practices. Appx68, Appx85-86, Appx875, Appx886, Appx892, Appx264, Appx268.

Not surprisingly, the Inspector General found incompetence, ignorance of the law, and even hostility to the law, throughout the Agency. The Agency admitted that *"contractors . . . were working without a valid contract"* for much of their tenures. Appx70, Appx876-877, Appx158 (emphasis added). The Agency knew that its "contractors may not have been aware that they were working without a valid contract." Appx82-84, Appx889-890, Appx891, Appx162. The Agency's Senior Procurement Executive "*admitted* . . . that he had signed contracts that did not comply with the FAR, and stated that his actions were due to *pressure . . . from program offices*." Appx83-84, Appx890, Appx179 (emphasis added).

16

The Inspector General determined that the Agency did not follow the FAR during the pre-solicitation, pre-award, or contract administration phases; did not provide adequate oversight of the acquisition process; and did not have contracting officers who met training requirements. Appx83, Appx890, Appx145, Appx151, Appx198, Appx201-202. The Inspector General cited systemic shortcomings in the Agency's contracting practices, including the absence of leadership in promoting an effective procurement process, a lack of accountability for noncompliance, and contracting officials who were not able or *willing* to award contracts in accordance with regulations. Appx84, Appx890, Appx151. In fact, the Agency used a contractor on one of the mis-labeled and unlawful contracts to provide the quintessentially governmental function of administering *other* mis-labeled and unlawful contracts. Appx83, Appx890, Appx197.

The Inspector General attributed the rampant use of prohibited contracts to the leadership's indifference to the law and the contracting officers' willingness to break the law. Appx83-84, Appx890-891, Appx151. In addition to direct supervision and other out-of-scope demands on Appellants, the agency's lawlessness led to, among other things:

1) none of the contracting officers interviewed during the audit "could elaborate on a difference in treatment between personal and nonpersonal services contractors, or full-time employees";

17

2) "contracting officials did not know the difference between personal and non-personal services contracts, which indicated a lack of awareness of the controlling statutes";

3) the Agency "allowed contractors to perform inherently governmental functions";

4) contractors' "services were regularly accepted before the contract was awarded or signed";

5) the Agency "allowed contractors to work without having any contract at all";

6) contractors' "services were accepted before funds were secured, and in a few instances, when funding was simply not available";

7) some officials "signed documents that were not in accordance with federal procurement regulations; and

8) by acquiring personal services in excess of Congress's authorization, the Agency had a reportable violation of the Anti-Deficiency Act."

Appx82-83, Appx889-890.

## F.    *Proceedings on the First Amended Complaint*

Count II of the FAC raised claims for breach of contract, whether express or implied, and in the alternative, for *quantum meruit*. Appx97-100. Appellants based their claims on the prohibited issuance of the contracts; the Agency's admission that it "cannot" issue such contracts; the contracts' falsified scopes of work; terms for compensation based on the false scopes; the Agency's administration of the contracts to acquire Appellants' out-of-scope personal services; and the Agency's anticipation of the present liability. Those allegations, and more, state legally sufficient claims for out of scope work in breach of express contract. They also

support the invalidation of the contracts and a remedy under implied terms or for *quantum meruit*.

Under either express or implied contracts, Appellants demanded fair market compensation for their personal services, including higher rates of pay, contributions to their payroll taxes, and the cash value of benefits that were wrongfully withheld. In *quantum meruit*, Appellants demanded the value of the services accepted by the Agency.

The Agency did not challenge the legal sufficiency of the claims. It sought dismissal only for an alleged failure to exhaust administrative remedies. The trial court rejected the defense. But instead of denying the motion as the Agency argued it, the court raised other defenses *sua sponte*, and suggested that the Agency file a supplemental brief.

The court ultimately dismissed Count II for lack of subject matter jurisdiction and failure to state a claim. The court failed to acknowledge the claim for breach of express contract, even after describing the claim and its supporting allegations. It rejected the claims for implied contract and *quantum meruit* because the Agency did not previously invalidate the contracts on its own initiative, without considering the court's power to void the contracts in this action. The court entered final judgment following dismissal of the complaint.

### G.     Proceedings on the Proposed Second Amended Complaint

Appellants timely moved under Rules 15(a)(2) and 59(e) for relief from judgment and leave to file the SAC. Appellants invoked the Supreme Court's precedent for "freely giv[ing]" leave to amend, post-judgment, in the absence of an apparent reason to the contrary. *Foman v. Davis*, 371 U.S. 178, 182 (1962). Appellants proposed the SAC to cure the trial court's stated reasons for dismissing the FAC.

Amended **Count II** is for Appellants' required provision of uncompensated, out-of-scope work in breach of the express contracts. Appx906-907. Appellants proposed the count to address the trial court's failure to recognize the claim as framed by the FAC. Each Appellant alleges in detail the provision of out of scope services in breach of contract. Appx894-895.

> Plaintiff[s] . . . worked on site at the VoA's headquarters[,] . . . worked regular hours scheduled by the BBG[,] . . . [and t]he BBG [] provided [] the equipment and programming [] used in [the] job. All of [the] work was in furtherance of the international broadcasting mission. Civil service employees performed similar tasks. The BBG's need for the services was expected to last more than one year, and in fact . . . lasted [several] years. Most importantly, government employees supervised [the] work.

Appx894-895.

Proposed **Count III** alleges that the express contracts were void in whole or in part. Appx907-909. Appellants thus worked under implied contracts or terms for the provision of personal services in exchange for fair market compensation. As

alleged, there will be abundant evidence of fair market compensation, including the

acquisitions of similar services in government and private sectors. The proposed

***Count IV*** invokes the trial court's power to void the contracts in their entirety and

award *quantum meruit*. Appx909-910. In addition to amending the counts, the

SAC makes supporting changes and corrections, and clarifies the sources and uses

of the cited admissions. Appx874.

At the hearing on the motion for leave, the trial court again raised defenses

*sua sponte*. It invoked a split in the circuits over the meaning of the Supreme Court

cases on which Appellants relied, asserting that in some circuits, post-judgment

amendments require satisfaction of either Rule 59 or 60, in addition to Rule 15.

The Agency never invoked the requirements of Rules 59 or 60, but the trial court

ultimately denied leave for failure to satisfy the requirements of Rule 59, and for

being futile under Rule 15. Appellants timely noticed this appeal.

## SUMMARY OF ARGUMENT

The Agency's liability for breach of express contract is the necessary result

of falsifying the contracts' scopes of work to evade the prohibition on contracting

for personal services. The trial court's own opinions state the elements of the

claim: The contracts specified and paid for independent contracting for non-

personal services, while the Agency was requiring Appellants to provide personal

21

services in the manner of employees. That is a sufficient claim for breach, stated in the trial court's own words.

The FAC and the proposed SAC provide substantial, additional support for the claim of breach of express contract. There are alleged breaches of at least five limits on Appellants' scopes of service. ***First***, the Agency required the provision of personal services through contracts that specified non-personal services. ***Second***, it did not allow Appellants to work as independent contractors, but forced them into *de facto* employment relationships. ***Third***, it subjected Appellants to continuous government supervision. ***Fourth***, it required Appellants to provide services that were integral to its governmental mission. Finally, ***fifth***, it required services of the type performed by federal employees. The trial court simply ignored the claim for breach of express contract in the FAC. It rejected the claim in the SAC with citation to contract provisions that the Agency might have honored; but honoring those provisions does not cure the well-pleaded breaches of entirely unrelated provisions for independent contracting and non-personal services.

The alternative claims are equally valid in both complaints. The Agency issued the contracts in violation of a prohibition. It later "concurr[ed]" that it ***"cannot"*** issue contracts for personal services in excess of the Congressional authorization. The purposes of the prohibition were to ensure that such contracts would never exist, and that Appellants would be employed and compensated under

the classification laws. The frustration of these purposes supports the avoidance of the contracts in whole or in part. Under *United States v. Amdahl Corp.*, 786 F.2d 387, 393 (Fed. Cir. 1986), the trial court was obligated to award *quantum meruit*. Alternatively, under *Barrett Ref. Corp. v. United States*, 242 F.3d 1055 (Fed. Cir. 2001), the trial court was obligated to award a "proper fair market valuation" pursuant to implied compensation terms.

The FAC thus "made a non-frivolous claim that [Appellants] are 'entitled to money from the United States' . . . because they have a contract right," whether express or implied. That right establishes the trial court's "jurisdiction to settle the dispute" and supports reversal of the order under Rule 12(b)(1). Appx8. The order under Rule 12(b)(6) is reversible because Appellants have demonstrated that they "can prove [a] set of facts in support of [their] claim that would entitle [them] to relief." *Greenlee Cty., Ariz. v. United States*, 487 F.3d 871, 877 (Fed. Cir. 2007) (citing *Southfork Sys., Inc. v. United States,* 141 F.3d 1124, 1131 (Fed.Cir.1998)).

For the same reasons, the trial court was in error when it rejected the SAC on the basis of futility. "Appellant[s] plead[ed] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," which overcomes the assertion of futility. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The trial court's holding under Rule 15 was an error of law, and as such, reversible as an abuse of discretion. *Foman*, 371 U.S. at 182. Under the

binding precedent of the Supreme Court, it was a further error to apply the

requirements of Rule 59. *Foman*, 371 U.S. at 182.

## ARGUMENT

## I.    Standard of Review

The order dismissing the FAC under Rules 12(b)(1) and (6) is subject to *de novo* review. *See Potter v. United States*, 424 F. App'x 941, 943 (Fed. Cir. 2011). "We review legal determinations . . . such as a dismissal for failure to state a claim . . . without deference." *Walls v. United States*, 582 F.3d 1358, 1363 (Fed. Cir. 2009). To determine whether plaintiffs failed to state a claim, the Court asks whether "it is beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Greenlee Cty., Ariz.*, 487 F.3d at 877 (Fed. Cir. 2007). Review of the decision on jurisdiction is also without deference. *See Taylor v. United States*, 303 F.3d 1357, 1359 (Fed. Cir. 2002). "In ruling on a 12(b)(6) motion to dismiss, the court must accept as true the complaint's undisputed factual allegations and should construe them in a light most favorable to the plaintiff." *Cambridge v. United States*, 558 F.3d 1331, 1335 (Fed. Cir. 2009) (citing *Papasan v. Allain*, 478 U.S. 265, 283 (1986); *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991)).

A trial court's denial of a motion for leave to amend a complaint is reviewed for abuse of discretion. *Sanofi-Aventis v. Apotex Inc.*, 659 F.3d 1171, 1181–82

(Fed. Cir. 2011); s*ee also Ajinomoto Co. v. Archer-Daniels-Midland Co.*, 228 F.3d 1338, 1350 (Fed. Cir. 2000). "A district court abuses its discretion when its decision is based on clearly erroneous findings of fact, [or] is based on erroneous interpretations of the law . . . ." *Sanofi-Aventis*, 659 F.3d at 1177. A denial of leave that is based upon a legal interpretation is reviewed *de novo*. *Sanofi-Aventis*, 659 F.3d at 1182 (citing *Spiegel v. Schulmann,* 604 F.3d 72, 78 (2d Cir.2010)).

A denial of leave to amend, even post-judgment, is reversible as an abuse of discretion "[i]n the absence of any apparent or declared reason -- such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment . . . ." *Foman*, 371 U.S. at 182-83.

To overcome futility, the proposed amendments must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible "when the Appellant pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). "[T]he court must accept as true the complaint's undisputed factual allegations and

should construe them in a light most favorable to the plaintiff." *Cambridge*, 558 F.3d at 1335 (citing *Papasan*, 478 U.S. at 283; *Gould*, 935 F.2d at 1274).

## II. The Trial Court's Dismissal of Count II of the FAC Was Reversible Error

When Agency leadership learned it was unlawfully acquiring personal services through contracts that were falsely scoped for non-personal services, it admitted its wrongdoing and estimated the extent of its liability. Yet the trial court excused the entire scheme as follows:

> The court . . . dismissed [Appellants'] breach of implied contract claim for lack of jurisdiction and for failure to state a claim. . . . [T]here was "no basis" on which to find an implied contract . . . beyond the scope of their express contracts. . . . Further, the court . . . generally lacks jurisdiction over *quantum meruit* or implied-in-law contract claims, except in circumstances where "a contractor provided goods or services to the government in good faith under an express contract, but that contract was later rescinded for invalidity." The court determined that the exception . . . did not apply . . . because . . . [*inter alia*] the express contracts had not been found [by the issuing Agency] to be invalid.

Appx3 (citations omitted).

Notably, the court ignored the claim for breach of express contract, even after stating the theory and the elements elsewhere in its opinion. The trial court's holdings on implied contract and *quantum meruit* are equally erroneous; they allowed the Agency to enjoy the protections of prohibited contracts, simply by refusing to invalidate them on the Agency's own initiative, and even after admitting their illegality.

26

**A.    It Was Error to Dismiss the Claim for Breach of Express Contract**

Count II of the FAC alleged breach of express contract. Appx70-71,

Appx90, Appx98, Appx100. The trial court acknowledged the elements of the

claim in the first paragraph of its opinion. According to the trial court, Appellants

"assert that although they were hired by the [Agency] as purchase order vendors

(or non-personal service contractors), they were in reality acting in the capacity of

personal service contractors." Appx1. The court further acknowledged that

Appellants' "*express contracts* with the Broadcasting Board constituted contracts

with the government for the purposes of this court's jurisdiction under the Tucker

Act," and that the Agency raised a defense to Appellants' "breach of contract

claim." Appx27 (emphasis added).

The Agency did not argue a failure to plead the elements of the claim, but

only a failure to exhaust administrative remedies. The trial court thus queried

whether Appellants' contract claims might be subject to the Contract Disputes Act.

Appx26-27. From the court's own opinion, it is impossible to miss the claim for

breach of express contract.

Yet, the trial court held that "Count Two . . . is not based on these express

contracts . . . ." Appx27. The error infected the court's decision on jurisdiction:

> [t]he general rule is that so long as the plaintiffs have made a
> nonfrivolous claim that they are "entitled to money from the United
> States" . . . because they have a contract right, this court has jurisdiction
> to settle the dispute. . . . [Appellants] allege that they worked . . . under

27

"independent contracts" . . . . ***Count Two, however, is not based on an entitlement to money damages under these express contracts***.

Appx28 (emphasis added) (citations and footnotes omitted).

The claim is plain on the face of the FAC. It alleges the Agency's "independent contracting" for "non-personal services." Appx67, Appx72-75, Appx79, Appx81-82, Appx84-85, Appx89, Appx1215, Appx1044, Appx1870, Appx690. As used in the contracts, these words materially limited Appellants' scopes of work, whether the terms are applied as defined in the law or as commonly used in plain English. *See NASCENT Grp., J.V. ex rel. Native Am. Servs. Corp. v. United States*, 103 Fed. Cl. 338, 362 (2012) (applying the established legal meaning of a contract term); *see also Enron Fed. Solutions, Inc. v. United States,* 80 Fed. Cl. 382, 393 (2008) ("start[ing] with the plain meaning"). Any latent ambiguity must be resolved against the Agency as the drafter. *W. Bay Builders, Inc. v. United States*, 85 Fed. Cl. 1, 16-17 (2008)

The legal meanings of "independent contracting" and "non-personal services" are the same as their plain meanings, and are consistently reported in, for example, Black's Law Dictionary 693 (5th ed. 1979); the FAR, at 48 C.F.R. § 2.101 and 48 C.F.R. § 37.104(d); the IRS's analysis of Appellant Peach's contracts;[3] and

---

[3] *See* Appx2074-2076; *see also* 26 U.S.C. § 3121(d)(2); 26 C.F.R. § 31.3121(d)-1; and 26 C.F.R. § 31.3401(c)-1.

the common law, which provides the test applied by the IRS. The Inspector

General followed the FAR, without objection from the Agency. Appx72-75,

Appx87. As shown above, the contracts incorporate the relevant provisions of the

FAR, and expressly restate the limits on Appellants' services in their own words.

Appellants alleged that the Agency breached these limits. Appellants worked

in *de facto* employment relationships, under federal supervision, on integral

governmental missions, and in the same manner as the Agency's federal

employees. Appx81-83, Appx87-88. Taken as true, these allegations state a *prima*

*facie* case of liability for breach of contract, or at the least, for an equitable

adjustment. *See Miller Elevator Co. v. United States*, 30 Fed. Cl. 662, 701,

*dismissed,* 36 F.3d 1111 (Fed. Cir. 1994). The law "provide[s] a breach remedy for

contractors who are directed by the government to perform work which is not

within the general scope of the contract," while different remedies apply to lesser

changes. *PCL Const. Servs., Inc. v. United States*, 47 Fed. Cl. 745, 804 (2000)

(citing *General Dynamics Corp. v. United States*, 218 Ct. Cl. 40, 49 (1978)); *see*

*also Allied Materials & Equip. Co. v. United States*, 569 F.2d 562, 563 (Ct. Cl.

1978); *Aragona Constr. Co. v. United States,* 165 Ct. Cl. 382, 391 (1964).

Thus, under the authorities cited in the trial court's opinion, the FAC

includes "a nonfrivolous claim that [Appellants] are 'entitled to money from the

United States'. . . because they have a contract right." Accordingly, the trial "court

29

has jurisdiction to settle the dispute." *Anchor Tank Lines, LLC v. United States*, 127 Fed. Cl. 484, 493 (2016) (quoting *Adarbe v. United States*, 58 Fed. Cl. 707, 714 (2003)); *see also City of Cincinnati v. United States*, 153 F.3d 1375, 1377 (Fed. Cir. 1998) (holding that a "non-frivolous assertion of an implied contract with the United States" is sufficient to establish subject matter jurisdiction in this court).

### B.   It Was Error to Dismiss the Claims for Breach of Implied Contract and Quantum Meruit

The trial court rejected the claims for implied contract and *quantum meruit* because the lawless Agency did not previously invalidate the prohibited contracts on its own initiative. Appx30. That is not a reason to reject the claims, but a re-statement of the wrong that the court was obligated to right. Appellants showed that the contracts were subject to avoidance. As alleged and briefed, the contracts were invalid when issued or became invalid as administered over time. Appx70, Appx90.

### 1.   *The Contracts' Invalidity*

Under FAR 37.104(a), "[t]he Government is normally required to obtain its employees by direct hire under competitive appointment or other procedures required by the civil service laws. Obtaining personal services by contract, rather than by direct hire, ***circumvents those laws*** . . . ." 48 C.F.R. § 37.104(a) (emphasis added). To prevent the circumvention of civil service laws, the regulation provides

that "[a]gencies **shall not award** personal services contracts **unless specifically authorized by statute** . . . ." 48 C.F.R. § 37.104(b) (emphasis added).

Here, the Agency was "specifically authorized" to use 60 personal services contracts. Pub. L. 107-228, Div. A, Title V, § 504, Sept. 30, 2002, 116 Stat. 1393. The authorization began under the Personal Services Contracting Pilot Program, which enacted a lawful but limited way to "hir[e] . . . personal services contractors, **without regard to** Civil Service and **classification laws** . . . ." Appx75-76, Appx882, Appx154 (emphasis added). Together, the authorization and the corresponding prohibition were intended to require the acquisition of personal services **with regard** to the classification laws in all but the 60 authorized instances.

Defendant exceeded the authorization, violated the prohibition, and defeated the purposes of the classification laws when it acquired Appellants' personal services by contract. The Agency's internal memoranda show that even **after learning** that the contracts were prohibited, the Agency's top executives chose to proceed in violation of law, because they did not wish to pay the compensation that the classification laws require. Appx68-69, Appx84, Appx157, Appx264-467. The Agency calculated that lawful acquisitions of personal services would cost up to an additional $30,000 per contractor per year. Appx69, Appx875-876, Appx266. The

31

Agency was ultimately forced to admit what it long knew: it ***"cannot"*** continue to employ personal service contractors in this fashion. Appx160, Appx245.

## 2.    *Implied Terms for Fair Compensation*

The precedent of the Federal Circuit provides a remedy by implied terms when a contract's express terms for compensation are prohibited. *See Barrett*, 242 F.3d 1055. In *Barrett*, the Court of Federal Claims awarded the contractor the fair market value of goods provided under an otherwise valid contract with a term that called for an unenforceable price adjustment. *Barrett Ref. Corp. v. United States,* 45 Fed. Cl. 166 (1999); s*ee also Barrett Ref. Corp. v. United States*, 42 Fed. Cl. 128 (1998). The Federal Circuit affirmed the trial court's "replacement" of the prohibited term with "a proper fair market valuation," and clarified that the provision was unenforceable because it "failed to comply with the Federal Acquisition Regulations." *Barrett*, 242 F.3d at 1058. Crucially, the contractor's receipt of prior payment did not bar recovery of additional payment, when the fair market analysis showed that an increment was due.

Here, the Agency knowingly broke the law by issuing the contracts in the first place, and set the compensation to match the under-scoping that concealed the violation. The contracts thus "circumvent[ed]" the classification laws, including 5 C.F.R. § 304.104(b)(3), under which an agency must consider the rates paid for similar work across the federal sector. The terms for compensation, and the

prohibited contracts in their entirety, are every bit as "unenforceable" as the pricing term in *Barrett*, and at least as ripe for avoidance. Under *Barrett*, once the illegal provisions are stricken, the express contracts incorporate implied-in-fact promises to pay fair market value.

Alternatively, under *Amdahl*,

in many circumstances it would violate good conscience to impose upon the contractor *all* economic loss from having entered an illegal contract. Where a benefit has been conferred by the contractor on the government in the form of goods or services, which it accepted, a contractor may recover at least on a *quantum valebant* or *quantum meruit* basis for the value of the conforming goods or services received by the government prior to the rescission of the contract for invalidity. The contractor is not compensated *under* the contract, but rather under an implied-in-fact contract.

*Amdahl*, 786 F.2d at 393 (emphasis in original).

The trial court reasoned, however, that "[t]he existence of an express contract precludes the existence of an implied contract dealing with the same subject, unless the implied contract is entirely unrelated to the express contract." *Atlas Corp. v. United States*, 895 F.2d 745, 754-55 (Fed. Cir. 1990). The trial court erroneously assumed the contested contracts' ***valid*** "existence," without pausing to consider the ***prohibition on their existence***. The trial court also failed to accept as true the Appellants' allegation that their personal services ***were factually unrelated*** to the falsely scoped "non-personal services" and the corresponding provisions for

33

under-compensation. At the least, these allegations raised issues of fact precluding dismissal. *See, e.g.*, *Twombly*, 550 U.S. 544; *see also Iqbal*, 556 U.S. 662.

Finally, the court held that it cannot incorporate statutory terms into express contracts. "The court cannot, however, use those findings as a basis to substitute or supplement compensation terms in plaintiffs' prior contracts with the Board with 'implied' terms entitling plaintiffs to the type of compensation they would have preferred to receive." Appx32.

There was never any need to do so. The *quantum* can be addressed as a matter of fact, as in *Barrett*. There will be ample evidence of the Agency's experience in compensating providers of such services. ***As a matter of fact***, any lawful proxy will follow the classification laws; those laws will set the market, but they need not be "incorporated" into Appellants' contracts. The Agency estimated that contractors on mis-labeled contracts are owed up to an additional $30,000 per year. Appx69, Appx875-876, Appx266. After trial, the court might accept that valuation, or some other valuation, as a matter of fact.

### 3. *Quantum Meruit*

According to the trial court, "[a]t the hearing, Appellants raised for the first time the argument that their express contracts . . . might have been void *ab initio* due to fraud, misrepresentation, or other defects, and that this could be an additional basis for their *quantum meruit* claims." Once again, the trial court

simply missed a claim, in error. The FAC alleged that the contracts were invalid *"when issued."* Appx70, Appx90 (emphasis added).

Under ample precedent, the Court of Federal Claims can determine the validity of a contract; invalid terms or entire contracts must yield to an implied term for a fair market valuation or *quantum meruit*. *Barrett*, 42 Fed. Cl. at 134; *see also United States v. North Am. Transp. & Trading Co.*, 253 U.S. 330, 335 (1920); *Amdahl*, 786 F.2d at 395; *Urban Data Systems, Inc, v. United States*, 699 F.2d 1147, 1154-55 (Fed. Cir. 1983); *Cities Service Gas Co. v. United States*, 500 F.2d 448, 457, 205 Ct. Cl. 16 (1974). The recovery is not determined under the contract as written, but under an implied-in-fact contract that the government will pay for what it accepts. *See, e.g., North Am. Transp.*, 253 U.S. at 335.

The trial court rejected Appellants' claims, noting that Appellants were paid as specified by their prohibited contracts. "Accordingly, and even if plaintiffs now wish to contend that these contracts are void, the court has no basis on which to take jurisdiction over plaintiffs' *quantum meruit* claim." Appx30. But under *Barrett,* 242 F.3d 1055, and other cited cases, payments under prohibited contracts do not save them from subsequent avoidance, nor bar an additional recovery. Here, in the absence of any valid contract, *quantum meruit* is the remedy.

The authorities cited in the trial court's opinion only confirm the point. *See American Telephone and Telegraph Company v. United States*, 177 F.3d 1368

35

(Fed. Cir. 1999) (abbreviated "*AT&T*"); *see also United Pac. Ins. Co. v. United States*, 68 Fed. Cl. 152, 159 (2005). In *AT&T*, the Department of Defense failed to comply with various prerequisites to issuing the contract, such as preparing certain internal reports and notices. The Federal Circuit declined to void the contract *ab initio*. The "[i]nvalidation of a contract is not a necessary consequence when a statute or regulation has been contravened, but ***must be considered*** in light of the statutory or regulatory purpose" of any laws that might have been broken. *AT&T*, 177 F.3d at 1374 (emphasis added). "Congress cannot have intended to charge the contracting partner with adverse consequences depending on whether the Defense Department carried out the ***internal*** responsibilities and filed the reports that Congress required." *AT&T*, 177 F.3d at 1375 (emphasis added).

The court was ***protecting the contractor's rights under the contract***, where the only flaw in the contract's issuance concerned an ***"internal"*** paper-keeping requirement. Similarly, in *United Pacific*, the court found that invalidation was ***"not essential to [the] public policy"*** of certain oversight procedures that the contracting agency failed to observe. *United Pac. Ins. Co.*, 68 Fed. Cl. at 159 (emphasis added).

This is a different case. Appellants are not seeking to protect the benefits of their contracts, but rather to redress injuries that the contracts deliberately inflicted. Further, the issuance of the contracts was in violation of more than ***"internal***

responsibilities." The Agency violated its responsibilities *to Congress*, which established federal policy in favor of appointments to federal employment instead of contracts for personal services, except where *Congress itself* authorizes the contracts. There were no "internal . . . reports" that could have saved these contracts from their inherent illegality. The FAR flatly prohibits their very existence. As the Agency *admitted* to the Inspector General, it *"cannot"* issue such contracts. That admission is fatal; at the least, it should be subjected to discovery.

Under *AT&T*, one "purpose of [the] laws that [were] broken" was to prevent these contracts from existing. Another purpose was to prevent the under-compensation at issue, by requiring appointment to federal service, with all the compensations specified by the classification laws. In the words of the FAR, the Agency "circumvented" Congress's will. If any law serves a purpose that is sufficient to invalidate an offending contract, it is the violated prohibition here. Following avoidance, the remedy is *quantum meruit*.

## III.    The Trial Court Erroneously Denied Leave to Amend

Appellants proposed the SAC after the trial court missed the FAC's claims for breach of express contract and for invalidating the contracts *ab initio*. The SAC breaks prior Count II into three separate counts and supplements the facts and theory. Appellants timely moved for leave to amend.

### A.    The Supreme Court "Mandate[s]" That Post-Judgment Leave "Shall Be Freely Given"

When a plaintiff moves simultaneously for relief from judgment and leave to amend under Rules 15(a)(2) and 59(e), the Supreme Court instructs that leave is freely given whenever the minimal requirements of Rule 15 are satisfied. *See Foman*, 371 U.S. at 182. The Supreme Court held there that the district court abused its discretion when it declined to grant leave:

> Rule 15(a) declares that **leave to amend "shall be freely given** when justice so requires"; **this mandate is to be heeded**. If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, **he ought to be afforded an opportunity to test his claim on the merits**. In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be "freely given."

*Foman*, 371 U.S. at 182 (emphasis added) (citations omitted).

Crucially, the judgment is automatically altered, as necessary to accept the amended pleading, whenever the movant satisfies Rule 15, and without regard to the requirements of Rule 59. *Foman*, 371 U.S. at 182. Here, the only contested issue under Rule 15 was futility.

### B.    The Proposed Amendments Are Not Futile

The trial court's holding of futility is in error for the same reasons its dismissal of the FAC was in error. As explained above, the claims for breach of

38

express contract, implied contract, and *quantum meruit* are legally sufficient. Appellants incorporate their arguments in support of the FAC here, in support of the SAC, which is made stronger by the proposed, supplemental allegations.

The amended claims for breach of express contract, implied contract, and *quantum meruit* thus contain "sufficient factual matter, [when] accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). The claims are facially plausible because "Appellant[s] plead[ed] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556); *see also Cambridge*, 558 F.3d at 1335 (the court must accept factual allegations as true).

### 1.   *Count II of the SAC Is Not Futile*

The SAC more specifically alleges the limits on the scope of "independent contract[ing]" for "non-personal" services, Appx882-883, Appx888, Appx906-907, and as shown below, it alleges breach and damages in greater detail. ***First***, the Agency subjected Appellants to government supervision, in breach of an express limit on scope. Appx883-884, Appx888, Appx906-907. Working under government supervision converts the contracted "non-personal services" to "personal services," in breach of a ***second*** limit on scope. Appx882-883, Appx888, Appx906-907. The provision of personal services, in turn, converts the promised

39

"independent contracting" to an employment relationship, in breach of a ***third*** limit on scope. Appx882-883, Appx888, Appx906-907. ***Fourth***, the Agency required Appellants to provide services that were integral to its governmental mission. Appx888, Appx894-895. ***Fifth***, it required services of the type performed by federal employees. Appx906-907. These are sufficient allegations of breach, supported by the findings of the Inspector General and the IRS, as well as the Agency's own admissions. Further, the Agency damaged Appellants by failing to compensate their out-of-scope services, Appx875, Appx875-877, Appx897-898 Appx907, which were more valuable than the contracted services, and more onerous and costly to deliver. Appx875-876, Appx891-892, Appx904.

As shown in support of the FAC, and more strongly alleged in the SAC, Appellants brought a legally sufficient claim for out of scope work. *See Miller Elevator Co.*, 30 Fed. Cl. at 701; *see also PCL Const.,* 47 Fed. Cl. at 804; *Allied Materials*, 569 F.2d at 563; *Aragona Constr.,* 165 Ct. Cl. at 391. The "factual content" of the SAC "allows the court to draw the reasonable inference that the [Agency] is liable for the misconduct alleged," defeating the assertion of futility. *Iqbal*, 556 U.S. at 678 (2009).

The trial court's contrary holding was erroneous. "[P]laintiffs have not plausibly alleged that the Board's supervision of Appellants was so pervasive and extensive as to constitute direction, supervision, or control . . . in breach of the

40

express contract terms, rather than being within . . . the Agency's right and obligation to inspect and accept or reject contractors' work in accord with the contractors' provision of nonpersonal services." Appx10-11. The trial court both misread the allegations and prematurely adjudicated facts. Appellants allege that they were "supervised," and not merely "inspected." Appx876, Appx888-890, Appx894-895, Appx897, Appx907.

That allegation of fact must be taken as true. Indeed, the IRS, the *Almutari* court, and the Inspector General found sufficient facts of "supervision" to constitute personal services under every contract they examined. Appellants re-allege the facts and findings of the prior decisions, which are attached to the pleadings, where available. In response to the prior decisions, the Agency ***"concur[red]"*** that it "***cannot***" contract for the services at issue, precisely because the services were "personal" by virtue of federal supervision. The record so far is entirely against the Agency. The burden shifts to the Agency to prove after discovery, and as a matter of fact, that it stayed within its right to "inspect" without crossing into "continuous supervision." On the threshold motion, the trial court was to examine only the allegations, and only for their legal sufficiency, without attempting to resolve such factual issues.

Supposedly contrary provisions of the contracts, as cited by the Agency and the trial court, do not change the relevant provisions of scope. The cited provisions

41

specify only the Appellants' place of service, a range of hours within which one Appellant could choose to complete her tasks, and in one Appellant's contract, the ownership of equipment. Appx9-10, Appx2052. These terms do not appear in every contract, and even where they do appear, ***other*** limits on scope still pertain, and ***they*** were breached.

Further, federal supervision is not the only alleged breach. The trial court never addressed allegations of providing services that were integral to the governmental mission or equal to the services of federal employees. "Independent contracts" do not allow for such work, according to provisions of the FAR. 48 C.F.R. § 37.104. The court never held, and the Agency never specifically denied, that these allegations state claims for breach.

Finally, every acquisition of personal services, by contract or otherwise, entails the employer's obligation to pay its share of the service provider's payroll taxes, as a matter of law, and as found by the IRS with respect to certain of the Agency's contractors. Appx86, Appx893. The Agency offered no defense to Appellants' claims for reimbursement of the payroll taxes that their employer wrongfully required them to pay. Appx69-70, Appx78, Appx86, Appx88-89, Appx96, Appx875-877, Appx884, Appx893, Appx896, Appx904.

### 2. *Proposed Counts III and IV are not Futile*

Proposed Count III, Appx907-909, seeks to replace void contracts or terms with implied contracts or terms for fair market compensation, under *Barrett*, 242 F.3d 1055, and other cited authorities. Proposed Count IV is for the avoidance of the contracts *ab initio* and a remedy in *quantum meruit* under *Amdahl* and other authorities. For the reasons given in support of the FAC, this claim is not futile, and is made stronger by the proposed amendments. In the SAC, the claim for avoidance *ab initio* cannot be missed:

- "[T]hese contracts were void in whole or in part, when issued or as administered over time." Appx896.
- "The statutory and regulatory purpose of the violated prohibition supports the voidance of the prohibited contracts." Appx908.
- "The contracts in excess of authority were void or are voidable, in whole or in part, for violating the prohibition, and Plaintiffs ask the Court to avoid them. The Court has the power to so rule. Following the voiding of the contracts in whole or in part, Plaintiffs request the Court's provision of implied terms of contract . . . ." Appx908.
- "Plaintiffs respectfully request the Court to void the contracts *in toto*, either when issued or when administered in such a manner as to begin the acquisition of personal services." Appx909.
- "[T]he express contracts were void in whole or in part, *ab initio* or as administered over time." Appx797, Appx2067.

*See also* Appx896, Appx908-910.

43

The trial court's stated reasons for finding futility are erroneous. *First*, the trial court reasoned *sua sponte* that the Agency, having issued only 44 of the 60 authorized contracts for personal services, had the authority to issue *16* more. Appx11-12. The court reasoned that the small, unused authority immunized the Agency's issuance of *616* more contracts. Under this precedent, an agency could issue exactly one contract for personal services less than authorized, and then mis-label one million more than authorized, without consequence.

At most, the Agency could have allocated *16* of the 616 prohibited contracts to the unused authorization. The fact is, the Agency mis-labeled *all 616* contracts, including Appellants' contracts; *never attempted the retroactive allocation* suggested *sua sponte* by the trial court; and *never claimed any power to re-allocate* Appellants' contracts. Appellants do not concede the legality of a retroactive reallocation. But if one were attempted, the odds are approximately 38 to 1 in favor of Appellants' contracts falling outside, and not within, the unused authorization.

The trial court's holding that "both assessments are reasonable" ignores a vast difference in degrees of reasonableness. On the trial court's own statement of the case, and the allegations of the SAC, there is more than sufficient "factual content [to] allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Appellants *alleged* that

their contracts were "void," "voidable," and *in violation of the prohibition*, all of which follows from being *outside* the authorization of 60. When accepted as true, these allegations preclude an allocation of Appellants' contracts to the unused authorization, especially on a threshold motion. Appx891, Appx2191.

Appellants do not bear the burden of proving on a threshold motion that their right to relief is not subject to the remote possibility of having their contracts fall "within the scope of the authorization." If the Agency wishes to prove affirmatively that it can beat the odds, and show that Appellants' contracts fell as a matter of fact within the 16, and not the 600, it can attempt to do so at trial. Appellants' allegations, taken as true, are more than sufficient to survive dismissal.

*Second*, the Agency argued that the contracts were not "prohibited," but merely "limited." The trial court erroneously agreed. Appx12-13. The court purported to find that a certain "flexibility [is] afforded to the [Agency] by the authorization" to use 60 contracts for personal services. Given the supposed flexibility, "[m]eeting the Board's hiring needs appears to take precedence over maintaining a strict limit on personal service contracts." But under the law, there is an *express* prohibition that defeats any *implied* "flexibility" or "precedence." "Agencies *shall not* award personal services contracts unless *specifically* authorized by statute . . . ." 48 C.F.R. § 37.104(b) (emphasis added). By any fair reading of the prohibition, *it maintains a perfectly strict limit that is equal to the*

45

*"specific[] authoriz[ation]."* Following the trial court's logic, a speed "limit" of 60 mph offers the flexibility to drive at 616 mph.

The Agency's top leadership conceded long ago that it has no flexibility at all. After getting caught by the Inspector General, "[t]he Agency concur[red] that it *cannot* employ personal service contractors in excess of those authorized . . . ." Appx85-86, Appx892 (emphasis added in SAC). The admitted meaning of the prohibition is no more than the plain and controlling meaning of the prohibition. Without it, the numerical authorization has no purpose; an Agency's unilateral sense of "precedence" can negate Congress's power to make the law; and "60" can equal "616" or "616,000," such is the nature of "flexibility."

*Third*, the trial court repeated the error that has infected its analysis of all claims in both complaints:

> [Appellants] also have not alleged that they performed additional work that went "beyond what was contemplated in their express contracts," which could establish a basis for an "entirely unrelated" implied contract. Thus, as held in the court's prior decision, the court cannot exercise jurisdiction over a claim for breach of implied contract because the terms of [Appellants'] express contracts control.

Appx13 (citations omitted). The trial court erred. Appellants clearly "allege[] that they performed additional work that went 'beyond what was contemplated in their express contracts' . . . ." By the trial court's own reasoning, those allegations open the door to implied terms.

**Fourth**, contrary to the Agency's argument, relevant **terms** were illegal, because **entire contracts** were illegal. In any event, the compensation terms were discretely illegal for violating the classification laws. Appx69, Appx88-89, Appx875-876, Appx896-897. More egregiously, the terms purporting to shift the Agency's share of payroll taxes violated the tax laws and subjected those terms to replacement with implied terms for a proper allocation of that share. Appx69-70, Appx78, Appx86, Appx88-89, Appx96, Appx875-877, Appx884, Appx893, Appx896, Appx904.

### C.    The Further Requirements Of Rule 59 Are Not Applicable

The Agency did not invoke the requirements of Rule 59. For this reason alone, it was error for the trial court to apply such requirements.

> The Federal Circuit "has not determined the standard to be applied when a party moves to amend its pleadings after judgment has been entered" . . . . *Stueve Bros. Farms*, 107 Fed. Cl. at 476. Other circuits are split as to whether the court should apply the "more lenient" Rule 15 standard "to determine both whether amendment is appropriate and whether to set aside or vacate the judgment under Rule 59 . . ." or to apply the "more rigorous" Rule 59 standard to set aside or vacate the judgment and subsequently apply the Rule 15 standard . . . . The court need not reach a decision . . . because neither the requirements for RCFC 59 nor for RCFC 15(a) are satisfied . . . .

Appx6.

It is not necessary for the Federal Circuit to "determine[] the standard." The Supreme Court did so in *Foman*. The "more lenient standard" is the binding standard. The holding of *Foman* is categorical and imperative. Even post-

47

judgment, "Rule 15(a) declares that leave to amend '***shall be freely given*** when justice so requires'; ***this mandate is to be heeded***," so long as there is no "apparent or declared reason" to the contrary. *Foman*, 371 U.S. at 182 (emphasis added). The Supreme Court gave no consideration to the requirements of Rule 59(e), which are conspicuously absent from the "apparent or declared reasons" to withhold leave. *Foman*, 371 U.S. at 182. The trial court's holding that Appellants failed to satisfy Rule 59 was error. Appellants "ought to be afforded an opportunity to test [their] claim[s] on the merits." *Foman*, 371 U.S. at 182.

## CONCLUSION

The Court should reverse the order of dismissal, the judgment, and the subsequent order denying leave to amend, and remand with instructions to accept the Second Amended Complaint for filing, or in the alternative, for further proceedings on the First Amended Complaint.

Respectfully Submitted,

Dated: June 16, 2017                THEMIS PLLC

  /s/ John Pierce
John P. Pierce
David L. Engelhardt
Michael P. Cone
2305 Calvert St. NW
Washington, DC 20008
Telephone: (202)567-2050
Facsimile: (202)567-2051
*Counsel for Appellants*

48

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that, on June 16, 2017, I electronically filed the foregoing Brief of Appellants with the Clerk of Court using the CM/ECF System, which will send notice of such filing to all registered users.

I further certify that, upon acceptance and request from the Court, the required paper copies of the foregoing will be deposited with United Parcel Service for delivery to the Clerk, UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT, 717 Madison Place, N.W., Washington, D.C. 20439.

Date: June 16, 2017                    /s/ John P. Pierce
                                       John P. Pierce

                                       *Counsel for Appellants*

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of Fed. R. App. P.
      32(a)(7)(B) because:

      this brief contains <u>11,022</u> words, excluding the parts of the brief
      exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P.
      32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

      this brief has been prepared in a proportionally spaced typeface using
      <u>Microsoft Word</u> in <u>14 point Times New Roman</u>.


Date: June 16, 2017                    <u>/s/ John P. Pierce</u>
                                       John P. Pierce

                                       *Counsel for Appellants*

# ADDENDUM

# In the United States Court of Federal Claims

No. 15-1555C

(Filed: January 18, 2017)

| | |
|---|---|
| SEH AHN LEE, et al., | ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| UNITED STATES, | ) ) |
| Defendant. | ) ) |

Motions for reconsideration and for leave
to file an amended complaint; RCFC 59(e);
RCFC 15(a)

_____

John P. Pierce, Themis PLLC, Washington, D.C., for plaintiffs. With him on the briefs and at the hearing were David L. Engelhardt and Michael Cone, Themis PLLC, Washington, D.C.

Hillary A. Stern, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With her at the hearing was Elizabeth Parish, Interim General Counsel, Broadcasting Board of Governors, Washington, D.C. With her on the briefs were Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Civil Division, and Robert E. Kirschman, Jr., Director, and Steven J. Gillingham, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C.

**OPINION AND ORDER**

LETTOW, Judge.

On August 24, 2016, the court issued a decision in this case dismissing the complaint of plaintiffs Seh Ahn Lee, Irina Ryan, Ahmad Nariman, and Mark Peach under Rules 12(b)(1) and 12(b)(6) of the Rules of the Court of Federal Claims ("RCFC"). *See Lee v. United States*, 127 Fed. Cl. 734 (2016). In their complaint, plaintiffs had alleged that they were retained under contracts as nonpersonal service vendors by the Broadcasting Board of Governors ("Broadcasting Board" or "Board"), an independent agency of the United States ("the government"), but throughout the performance of the contracts they acted in the capacity of personal service contractors. Plaintiffs invoked a right to monetary relief under the Back Pay Act, 5 U.S.C. § 5596, or, alternatively, for breach of an implied contract. They sought to recover the compensation they believed would be appropriate for the services they provided to the government had their contracts been properly classified as personal service contracts. Plaintiffs also alleged that they were bringing suit as representatives of a class of contractors who were similarly situated to them.

On September 22, 2016, plaintiffs filed concurrent motions for reconsideration and for leave to file a second amended complaint pursuant to RCFC 59(e) and 15(a), respectively. Pls.' Mot. for Leave to File Second Am. Compl. ("Pls.' Mot."), ECF No. 29. In their proposed second amended complaint, plaintiffs would preserve their Back Pay Act claim for purposes of appeal (Count I) and bring new claims for breach of express contract (Count II), breach of implied contract (Count III), and relief in *quantum meruit* (Count IV). Plaintiffs now assert that their contracts with the Broadcasting Board are void because they exceed the Board's authority to issue personal service contracts, and plaintiffs again claim that they are entitled to damages in an amount commensurate with the compensation they allegedly should have been paid as personal service contractors. Plaintiffs also allege that at times they performed personal services for the Broadcasting Board without being subject to any express contract, during which times they claim that they are entitled to damages for the fair market value of the services performed. In response, the government argues that the new claims fail to cure the jurisdictional defects identified in the court's prior opinion and also fail to state claims upon which relief could be granted.

For the reasons stated, both plaintiffs' motion for reconsideration and motion to amend are denied.

## BACKGROUND

The court's prior opinion set forth the pertinent facts in detail. The Broadcasting Board is an independent agency of the United States, established in 1994 to "streamline" the government's management of its international broadcasting activities through organizations such as Voice of America. *Lee*, 127 Fed. Cl. at 737 (citing United States International Broadcasting Act of 1994, Pub. L. No. 103-236, §§ 301-15, 108 Stat. 382 (1994) (codified at 22 U.S.C. §§ 6201-16)). Since 1999, the Board has been an independent agency under the general oversight of the Secretary of State. *Id.* (citing Omnibus Consolidated and Emergency Supplemental Appropriations Act of 1999, Pub. L. No. 105-277, § 1323, 112 Stat. 2681 (1998)). Plaintiffs are "four individuals who provided services to various elements of Voice of America – an organization within the Broadcasting Board – either directly through individual purchase order vendor contracts or as independent subcontractors to staffing agencies under prime contracts with the Board." *Id.* Plaintiffs allege that approximately 660 potential class members served under similar contracts with the Board. *Id.*; *see also* [Proposed] Second Am. Compl. ¶ 10.

In 2013, the Department of State's Office of the Inspector General ("OIG") conducted an investigation into the Board's contracting practices. *See Lee*, 127 Fed. Cl. at 737-39; [Proposed] Second Am. Compl. Ex. A (Audit of the Broadcasting Board of Governors Administration and Oversight of Acquisition Functions (June 2014) ("OIG Report")), ECF No. 29-4. In this investigation, the OIG determined that the Broadcasting Board most likely exceeded its statutory authority to award personal service contracts. *Lee*, 127 Fed. Cl. at 738 (citing OIG Report at 15). Pursuant to the Foreign Relations Authorization Act, Fiscal Year 2003, Pub. L. No. 107-228, § 504, 116 Stat. 1350 (2002) (codified at 22 U.S.C. § 6206 note), the Board was authorized to hire up to 60 individuals under personal service contracts, but the OIG concluded that the Board likely exceeded this limit "by awarding an overwhelming majority of all service[] contracts as nonpersonal service[] contracts, though they were personal in nature." *Lee*, 127 Fed. Cl. at 738 (citing OIG Report at 15). The Board disagreed with the OIG's determination that the Board had exceeded its statutory authority, but it indicated that it would shift away from using nonpersonal service "purchase order vendor" contracts and towards hiring subcontractors through staffing

2

agencies to perform the same functions as the purchase order vendor contractors.  *See id.* at 739 (citing OIG Report at 16-17).

Following the OIG investigation and report, plaintiffs filed their original complaint on December 21, 2015 and an amended complaint on March 7, 2016.  In the amended complaint, plaintiffs alleged "that their contracts with the Broadcasting Board, as well as those of other potential class members, fall within the type of contracts that, according to the OIG's analysis, should have been classified as personal service contracts."  *Lee*, 127 Fed. Cl. at 739.  They therefore claimed an entitlement to higher salaries and greater benefits commensurate with the amounts paid to contractors performing under personal service contracts, and brought claims to recover those amounts under the Back Pay Act and under a theory of breach of implied contract. *Id.*

In its prior opinion, the court dismissed the Back Pay Act claim for lack of jurisdiction, determining that plaintiffs did not fall within the class of individuals covered by the Back Pay Act because they were never appointed to the civil service.  *See Lee*, 127 Fed. Cl. at 740-43. Plaintiffs' assertion that they "should have been" appointed because they were purportedly performing personal services was deemed insufficient to create jurisdiction under the Back Pay Act.  *See id.*  The court held that plaintiffs were serving under express contracts at the relevant time, so plaintiffs could not "plausibly allege[] that they were federal employees during the relevant time period" because work under a contract and employment by appointment are "mutually exclusive."  *Id.* at 742-43 (quoting *Calvin v. United States*, 63 Fed. Cl. 468, 472 (2005), in turn citing *Collier v. United States*, 56 Fed. Cl. 354, 356-57 (2003), *aff'd*, 379 F.3d 1330 (Fed. Cir. 2004)).

The court also dismissed plaintiffs' breach of implied contract claim for lack of jurisdiction and for failure to state a claim.  As to lack of jurisdiction, the court held that there was "no basis" on which to find an implied contract between plaintiffs and the Broadcasting Board for services and compensation beyond the scope of their express contracts.  *Lee*, 127 Fed. Cl. at 745 (citing *Atlas Corp. v. United States*, 895 F.2d 745, 754-56 (Fed. Cir. 1990); *Algonac Mfg. Co. v. United States*, 428 F.2d 1241, 1255 (Ct. Cl. 1970)).  Further, the court held that it lacked jurisdiction to consider plaintiffs' *quantum meruit* theory, through which plaintiffs argued that the government received the benefit of plaintiffs' performance of personal services without adequately compensating them.  *See id.* at 745-46.  This court generally lacks jurisdiction over *quantum meruit* or implied-in-law contract claims, except in circumstances where "a contractor provided goods or services to the government in good faith under an express contract, but that contract was later rescinded for invalidity."  *Id.* at 746 (citing *United States v. Amdahl Corp.*, 786 F.2d 387, 393 (Fed. Cir. 1986)).  The court determined that the exception identified in *Amdahl* did not apply to plaintiffs' *quantum meruit* claim because plaintiffs did not allege that they were paid less than the rate specified in the express contracts, and the express contracts had not been found to be invalid.  *Id.* at 746.  Therefore, the court lacked jurisdiction over the *quantum meruit* claim.  Finally, the court dismissed the claim for breach of implied contract for failure to state a claim upon which relief could be granted.  Construing the claim to allege that certain compensation terms (*i.e.*, for personal-services compensation) were omitted from the express contracts, the court found that plaintiffs had not plausibly alleged that such terms were "essential" to their express contracts such that the court could properly supplant the express compensation terms in their contracts with terms reflecting plaintiffs' "preferred" compensation at the rate for personal services.  *Id.* at 746-48.  Accordingly, the court dismissed plaintiffs'

3

complaint in its entirety and denied their motion for class certification as moot.  Judgment was entered on August 25, 2016.

Plaintiffs' motions for reconsideration and to file a second amended complaint were timely filed on September 22, 2016.  Count I of the proposed second amended complaint preserves plaintiffs' previously-dismissed Back Pay Act claim solely for purposes of appeal.  *See* [Proposed] Second Am. Compl. ¶ 113; Pls.' Reply Brief in Further Support of Their Mot. for Leave to File the Second Am. Compl. ("Pls.' Reply") at 2, ECF No. 35.  The remaining counts amend and supplement plaintiffs' contract claims.

In Count II, plaintiffs allege breach of their express contracts with the Broadcasting Board.  They claim that their express contracts for nonpersonal services entitled them to certain "rights" of independent contracting, such as "a high degree of independence in choosing the time, place, and manner of service" and "the autonomy to work on many projects from many clients simultaneously," in exchange for a "corresponding reduction in compensation." [Proposed] Second Am. Compl. ¶¶ 125-26.  Plaintiffs allege that their contracts were breached because they were paid at independent-contractor rates but had to "report to a federal office chosen by the [Broadcasting Board]" rather than work from a preferred location, could not use their own equipment, set their own hours, or work for other clients, and were directly supervised by employees of the federal government.  [Proposed] Second Am. Compl. ¶ 129.  Additionally, plaintiffs allege that the Board "demanded, received, and accepted personal services, which were outside the scope of work under the express contracts" in further breach of said contracts. [Proposed] Second Am. Compl. ¶ 130.

In Count III, presented in the alternative to Count II, plaintiffs allege that their contracts with the Broadcasting Board "were void or are voidable, in whole or in part," such that they are entitled to recover upon implied contracts with the Board.  [Proposed] Second Am. Compl. ¶¶ 138, 140.  The Federal Acquisition Regulations ("FAR") state that "[a]gencies shall not award personal services contracts unless specifically authorized by statute," 48 C.F.R. § 37.104(b), and the Board was only authorized to award up to 60 such contracts, 22 U.S.C. § 6206 note, subsection (b)(4).  Plaintiffs allege that their contracts were outside the scope of this authorization, rendering the contracts void.  [Proposed] Second Am. Compl. ¶¶ 135-38.  As a result, plaintiffs ask the court to provide implied contract terms that reflect the scope of plaintiffs' personal-service work and "compensate[] [p]laintiffs for the fair market value of their services."  [Proposed] Second Am. Compl. ¶ 140.  Additionally, plaintiffs newly allege that they worked for the Broadcasting Board at times when they were not party to any express contract because, "among other reasons," their prior contracts had lapsed prior to renewal.  [Proposed] Second Am. Compl. ¶ 141.  Plaintiffs claim that during these periods they were parties to implied contracts with the Board for personal services in exchange for the fair market value of such services, and that any payments to plaintiffs by the Board in amounts less than the fair market value of personal services constitute breaches of these implied contracts.  [Proposed] Second Am. Compl. ¶¶ 141, 145.

Count IV, presented in the alternative to Counts II and III, seeks damages under a *quantum meruit* theory.  Plaintiffs reassert that the express contracts are void and that they worked at times for the Board without any express contract.  [Proposed] Second Am. Compl. ¶¶ 149, 154.  Plaintiffs thus allege that they are entitled to damages in *quantum meruit* for the value of services provided under the void contracts and at the times when no express contract governed

4

the relationship between plaintiffs and the Board, in an amount equaling the difference between the fair market value of services provided and the payments previously received.  [Proposed] Second Am. Compl. ¶¶ 156-59.

Plaintiffs also append new exhibits to their proposed second amended complaint.  In addition to refiling the June 2014 OIG Report regarding the Board's contracting practices, *see* [Proposed] Second Am. Compl. Ex. A, plaintiffs have submitted various documents relating to the contracts between the Board and plaintiffs Peach, Lee, and Ryan, including some of the contracts themselves.  For plaintiff Peach, who has been a contractor with the Board since 2007, *see* [Proposed] Second Am. Compl. ¶ 26, one contract spanning from October 1, 2009 to September 30, 2010 has been provided, [Proposed] Second Am. Compl. Ex. B, ECF No. 29-4.  For plaintiff Lee, who was a contractor with the Board from 2003 to 2015 and has been a subcontractor to the Board employed by Technologist, Inc. since 2015, *see* [Proposed] Second Am. Compl. ¶ 23, a number of contract iterations and related documents from 2008 to 2015 have been provided to the court, [Proposed] Second Am. Compl. Ex. C, at 3-261, ECF 29-5.  The Federal Contract Compliance Manual, published in July 2013, has also been included within Exhibit C, *see* [Proposed] Second Am. Compl. Ex. C, at 262-798, along with an untitled ten-page document that appears to be a part of instructions to offerors for a Broadcasting Board contract solicitation, *see* [Proposed] Second Am. Compl. Ex. C, at 799-808.  For plaintiff Ryan, who was a contractor with the Board at various times between 2000 and 2015 and has been a subcontractor to the Board employed by CTS-Computer Technology Services, Inc. since 2015, *see* [Proposed] Second Am. Compl. ¶ 24, the court has received various contract iterations and related documents spanning from 2009 to 2015, [Proposed] Second Am. Compl. Ex. D, ECF No. 29-6.  No contract documentation has been provided with regard to plaintiff Nariman, who was a contractor with the Board from 2007 to 2013.  *See* [Proposed] Second Am. Compl. ¶ 25.

Plaintiffs' motions for reconsideration and to file their second amended complaint have been fully briefed and were addressed at a hearing on December 15, 2016.

### STANDARDS FOR DECISION

RCFC 59(e) allows a party to file a motion to amend or alter a final judgment within 28 days of the entry of judgment.  Pursuant to RCFC 59:

> (a) The court may, on motion, grant a new trial or a motion for reconsideration on all or some of the issues – and to any party – as follows:
>
>> (A) for any reason for which a new trial has heretofore been granted in an action at law in federal court; [or]
>>
>> (B) for any reason for which a rehearing has heretofore been granted in a suit in equity in federal court.

RCFC 59(a)(1)(A), (B).  The party submitting a motion for reconsideration bears the burden of "show[ing] exceptional circumstances justifying relief based on manifest error of law or mistake of fact."  *Jackson v. United States*, __ Fed. Appx. __, __, 2016 WL 6518563, at *3 (Fed. Cir. Nov. 3, 2016) (quoting *Kaplan v. United States*, 115 Fed. Cl. 491, 493 (2014), in turn quoting *Stueve Bros. Farms, LLC v. United States*, 107 Fed. Cl. 469, 474 (2012), *aff'd*, 737 F.3d 750

5

(Fed. Cir. 2013)).  The moving party must specifically show: "(1) the occurrence of an intervening change in the controlling law; (2) the availability of previously unavailable evidence; or (3) the necessity of allowing the motion to prevent manifest injustice."  *Stueve Bros. Farms*, 107 Fed. Cl. at 474-75 (quoting *Matthews v. United States*, 73 Fed. Cl. 524, 526 (2006)).

Under RCFC 15, "a party may amend its pleading only with the opposing party's written consent or the court's leave.  The court should freely give leave when justice so requires."  RCFC 15(a)(2).  While the court has discretion to grant or deny leave to amend, factors such as "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment" counsel against granting a party's motion for leave to amend.  *Foman v. Davis*, 371 U.S. 178, 182 (1962).

The Federal Circuit "has not determined the standard to be applied when a party moves to amend its pleadings after judgment has been entered" pursuant to the Rules of the Court of Federal Claims.  *Stueve Bros. Farms*, 107 Fed. Cl. at 476.  Other circuits are split as to whether the court should apply the "more lenient" Rule 15 standard "to determine both whether amendment is appropriate and whether to set aside or vacate the judgment under Rule 59 or Rule 60," or to apply the "more rigorous" Rule 59 standard to set aside or vacate the judgment and subsequently apply the Rule 15 standard to allow amendment of the complaint.  *Id.* (comparing the "more lenient" standard applied in the 4th and 5th Circuits to the "more rigorous" standard applied in the 1st, 3rd, and 7th Circuits).[1]  In the circuits applying the "more rigorous" two-part standard, "courts may deny both the motion to reopen the judgment and the motion to amend the complaint if the proposed amendment would be futile."  *Id.* (citing *Ahmed*, 297 F.3d at 209).

### ANALYSIS

The court need not reach a decision regarding the split in authority over the standard to be applied in this court for concurrent motions for reconsideration and to amend the pleadings after the entry of judgment, because neither the requirements for RCFC 59 nor for RCFC 15(a) are satisfied in this case.  *See Piotrowski v. United States*, No. 13-760C, 2015 WL 1651610, at *4 n.3 (Fed. Cl. Apr. 10, 2015) (determining that the court did not need to resolve the split in authority regarding the standards for concurrent motions under RCFC 59(e) and 15(a) because the more lenient amendment standard was not satisfied).

*A. Motion for Reconsideration Pursuant to RCFC 59(e)*

Plaintiffs do not allege a change in the controlling law or that new, previously unavailable evidence relevant to their claims has now become available.  Thus the court construes plaintiffs' motion to allege that reconsideration of the previously-entered judgment is necessary to prevent manifest injustice.  *See Stueve Bros. Farms*, 107 Fed. Cl. at 475.  In this

---

[1]For the "more lenient" standard, *Stueve Bros. Farms* cites *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 471 (4th Cir. 2011), and *Dussouy v. Gulf Coast Inc. Corp.*, 660 F.2d 594, 597 n.1 (5th Cir. 1981).  For the "more rigorous" standard, *Stueve Bros. Farms* cites *Palmer v. Champion Mortg.*, 465 F.3d 24, 30 (1st Cir. 2006); *Ahmed v. Dragovich*, 297 F.3d 201, 207-08 (3d Cir. 2002); and *First Nat'l Bank of Louisville v. Continental Ill. Nat'l Bank & Trust Co. of Chi.*, 933 F.2d 466, 468 (7th Cir. 1991).

6

context, plaintiffs must demonstrate that the prior judgment creates an obvious injustice that is "apparent to the point of being almost indisputable." *Pacific Gas & Electric Co. v. United States*, 74 Fed. Cl. 779, 785 (2006), *aff'd in part and rev'd in part*, 536 F.3d 1282 (Fed. Cir. 2008). It is not sufficient for plaintiffs to reassert the same arguments they made in earlier proceedings, nor can plaintiffs raise new arguments that could have been made earlier. *See Freeman v. United States*, No. 01-39L, 2016 WL 943859, at *2 (Fed. Cl. Mar. 1, 2016) (internal citations omitted); *Stueve Bros. Farms*, 107 Fed. Cl. at 475. A motion for reconsideration will only be granted in exceptional circumstances; it is not an opportunity for "an unhappy litigant [to have] an additional chance to sway the court." *Stueve Bros. Farms*, 107 Fed. Cl. at 475 (internal quotation marks and citations omitted); *Bannum, Inc. v. United States*, 59 Fed. Cl. 241, 243 (2003).

Plaintiffs have failed to demonstrate that reconsideration is necessary to prevent manifest injustice in this case. Rather than bringing claims directly under the Back Pay Act and for breach of implied contract based on plaintiffs' purported provision of personal services, plaintiffs now claim that their express contracts have been breached or are void because the Broadcasting Board allegedly required them to perform personal services even though plaintiffs were classified as independent contractors performing nonpersonal services. The crux of plaintiffs' new claims is the same as that of the claims previously dismissed by the court – that their contracts with the Broadcasting Board should have been classified as personal service contracts rather than purchase order or nonpersonal service contracts, and that plaintiffs are entitled to additional compensation and benefits commensurate with those provided to personal service contractors. They have merely altered how their claims are framed in attempting to "cure[] the [c]ourt's grounds for dismissal." Pls.' Mot. at 1. Although the claims rest on a different legal theory, plaintiffs' arguments regarding the allegedly improper classification of their contracts are essentially the same as those that were brought in the previous proceeding and were rejected by the court. *Compare, e.g.*, Pls.' Opp'n to Def.'s Mot. to Dismiss at 1, ECF No. 15 ("[T]he [Broadcasting Board] issued thousands of contracts for 'personal services' in willful violation of law, deliberately denied the contractors the benefits and rates of pay that were commensurate with their actual service, and fraudulently labeled the contracts for 'non-personal' services to conceal the lawlessness and under-compensation."), *with* Pls.' Mot. at 6 ("As alleged, every contract ultimately was for acquisition of personal services in excess of [d]efendant's statutory and regulatory authority, which is strictly prohibited."). Further, plaintiffs do not allege that the court's prior decision rested upon a manifest error of law or mistake of fact, let alone allege that such error was patently obvious. Rather, the allegations are based on the same facts as plaintiffs' previously-dismissed complaint, couched in a different legal framework.

The one new element plaintiffs introduce, concerning work performed during periods of time when they were not subject to any express contract with the Broadcasting Board, is unavailing because this allegation could have been made during the prior proceedings. *See General Elec. Co. v. United States*, 416 F.2d 1320, 1322 (Ct. Cl. 1969) (explaining the "general principle" that "requests for post-decision relief will be rejected if the plaintiff has, without sufficient excuse, failed to make his point prior to the decision"). Notably, plaintiffs have not alleged that new evidence regarding this prior work only became available after the court's entry of judgment. In sum, plaintiffs have not demonstrated the existence of extraordinary circumstances to support reconsideration of the court's judgment if the governing criteria turn on RCFC 59(e), standing alone.

*B. Motion to Amend Complaint Pursuant to RCFC 15(a)*

If plaintiffs' motions are to be adjudged under RCFC 15(a), plaintiffs' second amended complaint must withstand challenges based on jurisdiction and adequacy of plausible factual allegations pursuant to the standards of RCFC 12(b)(1) and 12(b)(6). The government argues that plaintiffs' amended complaint fails to cure the jurisdictional defects identified by the court in its original opinion, and that plaintiffs are "attempt[ing] to assert new claims that are not supported by their allegations." Def.'s Opp'n to Pls.' Mot. for Leave to File Second Am. Compl. ("Def.'s Opp'n") at 3, ECF No. 32. Although not specifically identified as such, the government appears to argue that plaintiffs' proposed amendments are futile. "When a party faces the possibility of being denied leave to amend on the ground of futility, that party must demonstrate that its pleading states a claim on which relief could be granted. . . ." *Kemin Foods, L.C. v. Pigmentos Vegetales del Centro S.A. de C.V.*, 464 F.3d 1339, 1354-55 (Fed. Cir. 2006). That in effect is the situation before the court, and plaintiffs have recognized as much and responded accordingly in their reply and at the hearing.

To determine whether the proposed amendments are futile, the court must examine whether they "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). The court must "draw on its judicial experience and common sense" when evaluating whether a claimed right to relief is plausible. *Id.* at 679. In doing so, the court "must accept as true the complaint's undisputed factual allegations and should construe them in a light most favorable to the plaintiff." *Cambridge v. United States*, 558 F.3d 1331, 1335 (Fed. Cir. 2009) (citing *Papasan v. Allain*, 478 U.S. 265, 283 (1986); *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991)). The court is not, however, similarly bound to accept legal conclusions contained in the same allegations. *Twombly*, 550 U.S. at 555.

Additionally, an amendment is futile, and thus leave to amend should be denied, when the court lacks subject matter jurisdiction over the proposed claims. *See Nesselrode v. United States*, 127 Fed. Cl. 421, 434 (2016); *see also Jackson*, __ Fed. Appx. at __, 2016 WL 6518563, at *3 (motion to amend properly denied when plaintiff "proposed no specific amendments that would cure the [previously identified] deficiencies" and the proposed amendments were outside the scope of the court's jurisdiction or time-barred). Jurisdiction in this case depends upon the Tucker Act, 28 U.S.C. § 1491, which states that this court "shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). In contract claims against the United States, "[t]he general rule is that so long as the plaintiffs have made a non-frivolous claim that they are entitled to money from the United States . . . because they have a contract right, this court has jurisdiction to settle the dispute." *Anchor Tank Lines, LLC v. United States*, 127 Fed. Cl. 484, 493 (2016) (internal quotation marks and citations omitted); *see also Engage Learning, Inc., v. Salazar*, 660 F.3d 1346, 1353 (Fed. Cir. 2011) ("[J]urisdiction under [the Tucker Act] requires no more than a non-frivolous *allegation* of a contract with the government.") (emphasis in original) (internal citations omitted).

8

*1. Count II: Breach of Express Contract.*

In Count II of the proposed second amended complaint, plaintiffs allege that the Broadcasting Board breached its express contracts with plaintiffs by requiring them to perform personal services while only compensating plaintiffs at the rates specified in their contracts. Specifically, plaintiffs assert that although their contracts classified them as "independent contractors" providing "non[]personal services," the Board denied them the rights and benefits enjoyed by independent contractors, such as working from a preferred location, using their own equipment, and working without direct federal supervision. [Proposed] Second Am. Compl. ¶¶ 123-29. They aver that the Board paid them lower salaries, as generally afforded to independent contractors, while essentially treating them as federal employees without paying them at federal salary rates. [Proposed] Second Am. Compl. ¶¶ 124-29. Plaintiffs also repeatedly assert that the Board required them to perform "personal services" outside the scope of their express contracts, alleging that they were subject to government supervision and control in the performance of their contractual duties. *See* [Proposed] Second Am. Compl. ¶ 130; Pls.' Mot. at 6; Pls.' Reply at 10-11. The government argues in response that plaintiffs fail to state a viable claim for breach of express contract because the terms of the contracts did not provide for the alleged "rights and benefits" plaintiffs claim were denied to them, but rather explicitly stated that plaintiffs had to, for example, work at a federal facility and use equipment provided by the government. Def.'s Opp'n at 3-4.

To state a claim for breach of contract, plaintiffs must allege "(1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach." *San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989). For the purposes of Count II, plaintiffs concede that their contracts with the Broadcasting Board are valid and enforceable. [Proposed] Second Am. Compl. ¶ 123. Accordingly, the court will look to the Board's duties arising out of the contracts, based on the express scope of the contracts, to determine whether such duties have been breached. The scope of an express contract is interpreted in light of its plain language. *Jowett v. United States*, 234 F.3d 1365, 1368 (Fed. Cir. 2000) (citing *McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1435 (Fed. Cir. 1996)). If the terms of the contract are unambiguous, the plain meaning controls. *Barron Bancshares, Inc. v. United States*, 366 F.3d 1360, 1375 (Fed. Cir. 2004). The court shall also read the contract as a whole and "endeavor to give a reasonable meaning to all its provisions." *Dick Pacific/GHEMM, JV ex rel. W.A. Bottling Co. v. United States*, 87 Fed. Cl. 113, 125 (2009) (citing *Jowett*, 234 F.3d at 1368).

While plaintiffs have provided an incomplete set of their contracts to the court, the plain language of the contracts that have been provided contradicts plaintiffs' allegations that they were entitled to certain "rights and benefits" as independent contractors with the Broadcasting Board. For example, the proposed second amended complaint alleges that plaintiffs were deprived of the ability to work from preferred locations and with their own equipment. *See* [Proposed] Second Am. Compl. ¶ 129. However, the express contracts explicitly state that the contractors must work from a Broadcasting Board location and perform their jobs using government equipment and resources. *See, e.g.*, [Proposed] Second Am. Compl. Ex. B, at 168 ("Contractor [Mark Peach] shall provide general studio lighting services utilizing [g]overnment equipment *on-site* at the office of the IBB technical facilities.") (emphasis added); [Proposed] Second Am. Compl. Ex. C, at 159-60 ("The [c]ontractor [Seh Ahn Lee] shall perform the following work at the IBB Voice of America Headquarters Building . . . unless otherwise

9

mutually agreed to by the Contracting Officer. . . . The [g]overnment will furnish office space . . . expendable supplies, and equipment (e.g., audio recording device, PC with LAN connection, fax and telephone as appropriate) *solely* for the [c]ontractor's use while performing the work prescribed herein.") (emphasis in original).  The Board did not breach the express terms of the contract by requiring plaintiffs to perform their work at the locations and with the equipment expressly specified in the contract, even if these are not the usual terms of independent contracting under the common law.[2]

The complaint also does not plausibly allege that plaintiffs' express contracts were breached because of "direct federal supervision."  [Proposed] Second Am. Compl. ¶ 129.  The sample contracts are identified as "nonpersonal services contracts" as defined in 48 C.F.R. § 37.101.  In relevant part, the contracts provide:

> It is, therefore, understood and agreed that the [c]ontractor and/or the [c]ontractor's employee: (1) Shall perform the services specified herein as independent contractors, not as employees of the [g]overnment; (2) Shall be responsible for their own management and administration of the work required and bear sole responsibility for complying with any and all technical, schedule, or financial requirements or constraints attendant to the performance of this contract; (3) *Shall be free from supervision or control by any [g]overnment employee with respect to the manner or method of performance of the services specified; but (4) Shall, pursuant to the [g]overnment's right and obligation to inspect, accept, or reject the work, comply with such general direction of the Contracting Officer or the duly Authorized Representative of the Contracting Officer (AR/CO) as is necessary to ensure accomplishment of the contract objective.*

[Proposed] Second Am. Compl. Ex. B, at 173 (emphasis added); *see also* [Proposed] Second Am. Compl. Ex. C, at 169, 189 (same).  The contracts also provide for the Board to regularly review the contractors' work to ensure compliance with the terms of the contracts and the requirements of the agency.  *See* [Proposed] Second Am. Compl. Ex. B, at 168 ("The quality and efficiency of the services performed by the contractor shall be reviewed on a regular basis to ensure the contractor is meeting the requirements of the [a]gency."); [Proposed] Second Am. Compl. Ex. C, at 161, 182 (same).  In their proposed second amended complaint, plaintiffs state in broad terms that they performed personal services under "direct federal supervision" without providing specific allegations regarding the scope and extent of that supervision.  By the plain language of the contracts, the Board had a duty to supervise and review contractors' work to

---

[2]Under the common law,

> To decide whether someone is an "employee" who can sue the agency [for discrimination under Title VII of the Civil Rights Act or the Rehabilitation Act] or an independent contractor who should be suing someone else, the D.C. Circuit has – helpfully – come up with a twelve-factor test.  *See Spirides* [*v. Reinhardt*, 613 F.2d 826, 831-32 (D.C. Cir. 1979)].  The "most important factor" is "the extent of the employer's right to control the 'means and manner' of the worker's performance." [*Spirides*, 613 F.2d] at 831.

*Almutairi v. International Broad. Bureau*, 928 F. Supp. 2d 219, 229-30 (D.D.C. 2013).

10

ensure that the contractors were fulfilling their obligations under the contracts. By reciting only general allegations of direct supervision, plaintiffs have not plausibly alleged that the Board's supervision of plaintiffs was so pervasive and extensive as to constitute direction, supervision, or control regarding plaintiffs' "manner or method of performance" in breach of the express contract terms, rather than being within the scope of review and compliance commensurate with the government's right and obligation to inspect and accept or reject contractors' work in accord with the contractors' provision of nonpersonal services.

In sum, plaintiffs have not alleged that the work they performed was outside the scope of their express contracts. Thus, plaintiffs have failed to state a claim for breach of express contract in their second amended complaint, and their motion to amend does not suffice with respect to Count II.

### 2. Count III: Breach of Implied Contract.

In Count III, plaintiffs allege that their contracts were issued outside of the Broadcasting Board's statutory authority to award personal service contracts. *See* [Proposed] Second Am. Compl. ¶¶ 134-38. Plaintiffs assert that this violation renders their contracts "void or . . . voidable, in whole or in part." [Proposed] Second Am. Compl. ¶ 138. Plaintiffs further allege that they provided services to the Broadcasting Board "at various times" without any express contracts because their contracts had lapsed. [Proposed] Second Am. Compl. ¶ 141. Plaintiffs request that the court "reform the contracts to correct illegal terms" by reading in implied terms under which plaintiffs provided personal services to the Board in exchange for compensation at "the fair market value of their services." [Proposed] Second Am. Compl. ¶¶ 140, 143-44.

First, plaintiffs' contracts are not void.[3] The relevant provision that sets forth the Board's authority to issue contracts is 48 C.F.R. § 37.104(b), which states that "[a]gencies shall not award personal services contracts unless specifically authorized by statute." The Broadcasting Board is authorized by statute to award 60 personal service contracts. *See Lee*, 127 Fed. Cl. at 738 n.2 and accompanying text (citing OIG Report at 10 & n.13; 22 U.S.C. § 6206 note). Plaintiffs allege that the Board exceeded this authorization, which thus rendered the contracts void, because of the OIG's finding that the Board "award[ed] an overwhelming majority of all services contracts as nonpersonal services contracts, though they were personal in nature." OIG Report at 15; *see also* [Proposed] Second Am. Compl. ¶ 56.

The court is generally reluctant to void a contract with the government on the basis of the government's noncompliance with a statutory or regulatory requirement. *See American Tel. & Tel. Co. v. United States*, 177 F.3d 1368, 1376 (Fed. Cir. 1999). The court will ordinarily defer to the judgment of the government in issuing the contract and find it valid, "impos[ing] the binding stamp of nullity only when the illegality is plain." *John Reiner & Co. v. United States*, 163 Ct. Cl. 381, 386 (1963); *see also Springfield Parcel C, LLC v. United States*, 124 Fed. Cl. 163, 183-90 (2015) (holding in a bid protest that a lease awarded by a federal agency was void

---

[3]The government asserts that the court held that plaintiffs' contracts were not void in its prior opinion. Def.'s Opp'n at 5. In fact, the opinion only mentions the issue in passing when holding that the court lacked jurisdiction over plaintiffs' *quantum meruit* claim. *See Lee*, 127 Fed. Cl. at 745-46. The court did not address this issue with respect to plaintiffs' claim for breach of implied contract, and thus will consider it in full here.

because it exceeded an explicit congressional limitation legitimated by statute).  In the circumstances at hand, the court is especially reluctant to void plaintiffs' contracts because the Broadcasting Board had statutory authority to issue a certain number of personal service contracts.  According to the OIG Report, during the evaluated time period (fiscal years 2011 and 2012), 44 contracts were "appropriately classified as [personal service contracts]," while 660 "may have been personal in nature."  OIG Report at 10, 75.  Beyond the 44 contracts expressly classified for personal services, the Board still had the authority to issue up to 16 additional personal service contracts.  If plaintiffs' contracts were in fact for personal services, it is impossible for the court to determine whether those particular contracts fell within or outside the statutory authorization.  Both assessments are reasonable.  The text of the authorization states that up to 60 people may be "employed at any one time as personal services contractors under the program."  22 U.S.C. § 6206 note, subsection (b)(4).  The statute does not, however, specify that the express contracts must be labeled for personal services; it merely states that 60 people may work as personal service contractors.  Thus, even though plaintiffs' contracts were not explicitly labeled for personal services, they could conceptually be included within the scope of the authorization if plaintiffs did in fact provide personal services to the Board.  *See John Reiner & Co.*, 163 Ct. Cl. at 386 ("If the contracting officer has viewed the award as lawful, and it is reasonable to take that position under the legislation and regulations, the court should normally follow suit.").

Even if plaintiffs' contracts fell outside the Broadcasting Board's authorization to issue personal services contracts, the contracts are not necessarily invalid.  As the Federal Circuit stated in *American Tel. & Tel.*:

> Invalidation of the contract is not a necessary consequence when a statute or regulation has been contravened, but must be considered in light of the statutory or regulatory purpose, with recognition of the strong policy of supporting the integrity of contracts made by and with the United States.  In *United States v. Mississippi Valley Generating Co.*, 364 U.S. 520 (1961), the Court explained that when a statute "does not specifically provide for the invalidation of contracts which are made in violation of [its provisions]" the court shall inquire "whether the sanction of nonenforcement is consistent with and essential to effectuating the public policy embodied in [the statute]."  *Id.* at 563.  Thus the policy underlying the enactment must be considered in determining the remedy for its violation, when the statute itself does not announce the sanction of contract invalidity.

177 F.3d at 1374.  Neither 22 U.S.C. § 6206 note nor 48 C.F.R. § 37.104 expressly provides for the invalidation of contracts issued outside the scope of the authorization.  Thus, the court looks to policy concerns underlying the invalidation of plaintiffs' contracts.

The legislative history of 22 U.S.C. § 6206 note does not indicate that Congress intended that personal service contracts be declared void if issued beyond the scope of the authorization.  *See Alabama Rural Fire Ins. Co. v. United States*, 215 Ct. Cl. 442, 454 (1978) ("[I]llegality may be proved with reference to legislative history. . . .").  The purpose of the authorization was to "provide greater flexibility to the Board in its employment practices."  H.R. Rep. No. 107-57, at 75 (2001).  Although the Board's authority to issue personal service contracts is "limited," Congress meant to allow the Board to hire contractors quickly and easily to satisfy certain broadcasting needs.  *Id.*  Meeting the Board's hiring needs appears to take precedence over

maintaining a strict limit on personal service contracts. The flexibility afforded to the Board by the authorization therefore indicates that contracts for personal services that otherwise would be valid but are issued beyond the 60 contract limit should not be deemed void.

Further, as a general matter, "invalidation of a contract after it has been fully performed is not favored," particularly where the government is alleged to have violated a statutory or regulatory requirement. *American Tel. & Tel.*, 177 F.3d at 1375; *see also United Pac. Ins. Co. v. United States*, 68 Fed. Cl. 152, 159 (2005) (refusing to declare a fully-performed contract invalid for violating regulatory oversight procedures because invalidation was "not essential to [the] public policy" of the statutes and regulations at issue). Plaintiffs have been contractors with the Broadcasting Board for several years under multiple contracts and contract renewals. Most of these contracts have been fully performed – plaintiffs have provided their services and the Board has paid them at the rate specified in the contracts. *See American Tel. & Tel.*, 177 F.3d at 1376 ("It is not before us to decide whether either party to the . . . contract could have voided the contract early in its life and without penalty; the contract was performed for over five years, with no record suggestion from either party that because of [the statutory requirement at issue] there was no contract."). This counsels against the court voiding plaintiffs' already-performed contracts, particularly in light of the aforementioned policy to provide the Board with flexibility in meeting its staffing needs.

Because plaintiffs have not sufficiently alleged that their contracts are retroactively void, the court lacks jurisdiction over their claim for breach of implied contract. As explained in the court's prior opinion in this case, "[t]he existence of an express contract precludes the existence of an implied contract dealing with the same subject, unless the implied contract is entirely unrelated to the express contract." *Lee*, 127 Fed. Cl at 745 (quoting *Atlas Corp.*, 895 F.2d at 754-56); *see also Algonac Mfg. Co.*, 428 F.2d at 1255 ("[A]s a general rule there can be no implied contract where there is an express contract between the parties covering the same subject."). Because the express contracts are not void, their terms control. Here, plaintiffs are essentially reasserting their argument that their express contracts "*should* have been styled as personal service contracts, in which case plaintiffs would have been entitled to compensation in the same manner as federal employees." *Lee*, 127 Fed. Cl. at 745 (emphasis in original). Plaintiffs also have not alleged that they performed additional work that went "beyond what was contemplated in their express contracts," which could establish a basis for an "entirely unrelated" implied contract. *Id.* (citing *Atlas Corp.*, 895 F.2d at 754). Thus, as held in the court's prior decision, the court cannot exercise jurisdiction over a claim for breach of implied contract because the terms of plaintiffs' express contracts control.

Essentially, plaintiffs appear to be asking the court to reform their contracts to conform to the requirements of personal service contracts, which is improper in this circumstance. The court has no juridical power to replace the terms of the express contracts with judicially crafted implied personal service contract terms. "The remedy of reformation is a narrow one, bringing a contract into conformity with 'the true agreement of the parties on which there was a meeting of the minds.'" *Northrop Grumman Corp. v. United States*, 47 Fed. Cl. 20, 41 (2000) (quoting *American President Lines, Ltd. v. United States*, 821 F.2d 1571, 1582 (Fed. Cir. 1987)). The court shall not "inject[] itself into the contracting process" to fashion an agreement it deems appropriate, or for which a party unilaterally advocates. *Id.* (citing *Atlas Corp.*, 895 F.2d at 749, in turn citing *American President Lines*, 821 F.2d at 1582). Plaintiffs have not alleged that they had a "meeting of the minds" with the Broadcasting Board beyond the express agreements for

13

nonpersonal services. Rather, plaintiffs are asking the court to substitute their preferred terms (*i.e.*, provision of personal services in exchange for fair market value) for the actual terms of the express contracts that have been deemed by the court not to be void. Such reformation is improper.

Reformation of plaintiffs' contracts is also improper under the so-called *Christian* doctrine. *See S.J. Amoroso Const. Co., Inc. v. United States*, 12 F.3d 1072, 1075 (Fed. Cir. 1993) (citing *G.L. Christian & Assocs. v. United States*, 312 F.2d 418 (Ct. Cl. 1963), *mot. for reh'g and reargument denied*, 320 F.2d 345 (Ct. Cl. 1963)). Pursuant to the *Christian* doctrine, "a mandatory contract clause that expresses a significant or deeply ingrained strand of public procurement policy is considered to be included in a contract [under the FAR] by operation of law." *Id.* (citations omitted). Thus, when improper FAR terms are incorporated into a contract, the correct FAR terms control even if they are not expressly stated in the contractual text. *See Bay Cty., Fla. v. United States*, 112 Fed. Cl. 195, 202 (2013) (citing *S.J. Amoroso*, 12 F.3d at 1075; *G.L. Christian & Assocs.*, 312 F.2d at 426), *aff'd*, 796 F.3d 1369 (Fed. Cir. 2015). Whether the *Christian* doctrine applies "turns not on whether the clause was intentionally or inadvertently omitted, but on whether procurement policies are being 'avoided or evaded (deliberately or negligently) by lesser officials.'" *S.J. Amoroso*, 12 F.3d at 1075 (quoting *G.L. Christian & Assocs.*, 320 F.2d at 351). In *Bay County*, for example, the court substituted a mandatory FAR clause into a contract in place of an improper clause that was an "impermissible deviation" from the correct FAR provision. 112 Fed. Cl. at 203. Here, without expressly stating it as such, plaintiffs basically seek to have the FAR provisions regarding personal service contracts incorporated into their contracts with the Board because of the Board's alleged deviation from FAR § 37.104(b) in exceeding the scope of its authority to issue personal service contracts. As previously explained, however, plaintiffs have not sufficiently alleged that their express contracts violated the FAR (*i.e.*, for exceeding the Board's authorization to issue personal service contracts) or that the Board treated plaintiffs as personal service contractors in breach of the express contracts. Consequently, plaintiffs have not proven that personal service terms are "mandatory" or that the terms actually contained within the contracts significantly deviate from plaintiffs' preferred terms in light of the work performed and compensation received by plaintiffs. Thus, plaintiffs have shown no basis upon which the court could or should reform the contract, and the *Christian* doctrine does not apply.

Finally, plaintiffs also fail to state a claim for breach of implied contract with regard to the gaps between express contract periods. Plaintiffs allege that these gaps occurred because of, "among other reasons, the lapse of a prior contract or the failure to perfect a new contract during periods when work was proceeding." [Proposed] Second Am. Compl. ¶ 141. Urging that they were not parties to any contract during these periods of time, plaintiffs contend that they should be compensated for the fair market value of personal services provided. [Proposed] Second Am. Compl. ¶ 141. This contention is not persuasive. Based on the course of dealing between the parties, the terms of the express contracts control during the gaps between express contract periods. When parties to a contract continue performance after the contract period has expired without an express agreement to renew or extend the contract, the court may infer that the parties intended to renew the contract under the same terms for a similar period of time. *See* 1 Arthur L. Corbin, et al., *Corbin on Contracts* § 1.19 (rev. ed. 1993). Although plaintiffs have provided an incomplete set of contracts to the court, it appears that the terms of plaintiffs' contracts did not materially change from period to period. *See, e.g.*, [Proposed] Second Am. Compl. Ex. C, at 3-261 (selected contracting documents between plaintiff Lee and the Broadcasting Board for

14

contract periods between 2008 and 2015). Thus, the court may reasonably infer that the terms of the expired express contracts governed the parties' performance during the gap periods. Because the court has concluded that these express contracts are not invalid, they supply the terms that govern during the gap periods. Plaintiffs have not alleged that they performed services other than those specified in the express contracts during the gap periods, and have not alleged that the Broadcasting Board did not continue to pay them at contract rates. Plaintiffs thus have failed to allege that the Board breached implied-in-fact contracts during the gap periods.

In sum, plaintiffs have failed to state a claim for breach of implied contract. Thus, their motion to amend is denied with respect to Count III.

### 3. Count IV: Quantum Meruit.

Plaintiffs' alternate claim for damages under the theory of *quantum meruit* in Count IV restates that their contracts are void or voidable because the contracts were issued outside of the Broadcasting Board's authority to award contracts for personal services. [Proposed] Second Am. Compl. ¶¶ 149-50. Plaintiffs also re-allege that they performed work at times when they were not party to any contract with the Board. [Proposed] Second Am. Compl. ¶ 154. Thus, plaintiffs claim that they are entitled to *quantum meruit* relief for the provision of personal services under void contracts or when they were not party to any contract, seeking as damages the difference between the fair market value of personal services and the payments made to plaintiffs under the express contract terms. [Proposed] Second Am. Compl. ¶¶ 155-59.

"A recovery in *quantum meruit* is based on an implied-in-law contract. That is, a contract in which there is no actual agreement between the parties, but the law imposes a duty in order to prevent injustice." *International Data Prods. Corp. v. United States*, 492 F.3d 1317, 1325 (Fed. Cir. 2007). As this court noted in its prior opinion, "[t]he Court of Federal Claims generally does not have jurisdiction over *quantum meruit* or implied-in-law contract claims." *Lee*, 127 Fed. Cl. at 745 (citing *International Data Prods*, 492 F.3d at 1325; *Trauma Serv. Grp., Ltd. v. United States*, 33 Fed. Cl. 426, 432 (1995), *aff'd*, 104 F.3d 1321 (Fed. Cir. 1997)). The limited exception to this rule identified by the Federal Circuit allows for recovery under a *quantum meruit* or *quantum valebant* theory[4] "when a contractor provided goods or services to the government in good faith under an express contract, but that contract was later rescinded for invalidity." *Id.* at 745-46 (citing *Amdahl*, 786 F.2d at 393). As the court held in its prior opinion, this exception is inapplicable to this case. The court has already explained at length that plaintiffs' express contracts are not void, and plaintiffs have not alleged that they were not paid the contract rate in full. *See International Data Prods.*, 492 F.3d at 1325-26 (finding that the *Amdahl* exception did not apply where a contract was "neither invalid nor unenforceable"); *United Pac. Ins. Co. v. United States*, 464 F.3d 1325, 1333-34 (Fed. Cir. 2006) (rejecting plaintiffs' reliance on *Amdahl* because the government had paid them the full amount due under the contract at issue). Further, the court has noted that the terms of the express contracts control the parties' performance during the gap periods. Since plaintiffs have not alleged that they were

---

[4]*Quantum valebant* relief, meaning "as much as it was worth," generally is awarded for implied-in-fact contracts regarding goods, while *quantum meruit* relief, meaning "as much as he merited," is awarded for implied-in-fact contracts for either goods or services. *Amdahl*, 786 F.2d at 393 n.6 (citing *Urban Data Systems, Inc. v. United States.*, 699 F.2d 1147, 1154-55 n.8 (Fed. Cir. 1983)).

not paid the full contract rate during these periods as well, they cannot sustain a plausible claim for additional payment under a *quantum meruit* theory.  Therefore, the court does not have jurisdiction over plaintiffs' amended *quantum meruit* claim, and their motion to amend must be denied with regard to Count IV.

**CONCLUSION**

For the reasons stated, plaintiffs' motions for reconsideration and for leave to file a second amended complaint are DENIED.

It is so **ORDERED**.

s/ Charles F. Lettow

Charles F. Lettow
Judge

# In the United States Court of Federal Claims

No. 15-1555C

(Filed: August 24, 2016)

| | | |
|---|---|---|
| | ) | |
| SEH AHN LEE, et al., | ) | Claims for civilian pay and breach of |
| | ) | contract; Back Pay Act, 5 U.S.C. § 5596; |
| Plaintiffs, | ) | absence of appointment to the civil service; |
| | ) | implied contract precluded by an express |
| v. | ) | contract dealing with the same subject; |
| | ) | dismissal pursuant to RCFC 12(b)(1) and |
| UNITED STATES, | ) | (6) |
| | ) | |
| Defendant. | ) | |
| | ) | |

John P. Pierce, Themis PLLC, Washington, D.C., for plaintiffs.  With Mr. Pierce at the hearing and on the briefs were David L. Engelhardt and Michael Cone, Themis PLLC, Washington, D.C.

Hillary A. Stern, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant.  With her at the hearing was Elizabeth Parish, Interim General Counsel, Broadcasting Board of Governors, Washington, D.C.  With Ms. Stern on the briefs were Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Civil Division, and Robert E. Kirschman, Jr., Director, and Steven J. Gillingham, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C.

**OPINION AND ORDER**

LETTOW, Judge.

Plaintiffs Seh Ahn Lee, Irina Ryan, Ahmad Nariman, and Mark Peach claim they are entitled to civilian pay and damages for breach of contract, alleging that the Broadcasting Board of Governors ("Broadcasting Board" or the "Board"), an independent agency of the United States (the "government"), denied plaintiffs full compensation and benefits for their work as contractors for the agency.  Plaintiffs assert that although they were hired by the Broadcasting Board as purchase order vendors (or nonpersonal service contractors), they were in reality acting in the capacity of personal service contractors.  Plaintiffs assert that they should be awarded monetary relief under the Back Pay Act, 5 U.S.C. § 5596, for certain wages, benefits, and tax payments to which they would have been entitled if their contracts had been properly classified as personal service contracts.  Alternatively, plaintiffs claim they should receive monetary damages as a result of the government's breach of an implied contract for compensation commensurate with their services in the capacity of personal service contractors.  Plaintiffs have included class allegations in their complaint and amended complaint, contending that

"approximately 660 persons [at the Board] have been providing personal services by means other than by federal appointment at any given time, including at present." Am. Compl. ¶ 102, ECF No. 7.  In that connection, plaintiffs have filed a motion to certify a class of persons who are said to have worked in the capacity of personal service contractors.  Pls.' Mot. to Certify Class, ECF No. 17.

Pending before the court is the government's motion to dismiss plaintiffs' complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC").  Regarding plaintiffs' civilian pay claim, the government asserts that plaintiffs have failed to state a valid claim for relief because the Back Pay Act only applies to government "employees" as defined by 5 U.S.C. § 2105(a), and plaintiffs have not alleged they fall within this defined group.  Def.'s Mot. to Dismiss ("Def.'s Mot.") at 7-8, ECF No. 12.  Regarding plaintiffs' breach of contract claim, the government argues that this court lacks subject matter jurisdiction because, under the Contract Disputes Act ("CDA") of 1978, recodified at 41 U.S.C. §§ 7101-7109, plaintiffs must first submit a claim to the appropriate contracting officer, and they have not done so.  Def.'s Mot. at 5-7.

The motions have been briefed and were addressed at a hearing on August 16, 2016.  For the reasons discussed, the government's motion to dismiss plaintiffs' complaint is GRANTED, and plaintiffs' motion to certify a class is DENIED as moot.

## BACKGROUND

The Broadcasting Board was established in 1994 to streamline management of the government's international broadcasting activities through organizations such as Voice of America, Radio Free Europe, and Radio Martí.  *See* United States International Broadcasting Act of 1994, Pub. L. No. 103-236, §§ 301-15, 108 Stat. 382 (1994) (codified at 22 U.S.C. §§ 6201-16); *see also* Am. Compl. ¶ 21; 5 U.S.C. § 104(1).  The Board initially operated as part of the United States Information Agency, but it became an independent government agency in 1999 under the general oversight of the Secretary of State, who serves as one of the nine voting members of the Board.  *See* Omnibus Consolidated and Emergency Supplemental Appropriations Act of 1999, Pub. L. No. 105-277, § 1323, 112 Stat. 2681 (1998).

Plaintiffs are four individuals who provided services to various elements of Voice of America – an organization within the Broadcasting Board – either directly through individual purchase order vendor contracts or as independent subcontractors to staffing agencies under prime contracts with the Board.  Am. Compl. ¶¶ 22-25.  Mr. Lee is a naturalized U.S. citizen from South Korea who has worked as a contractor for nearly 13 years, including under a subcontract with Technologist, Inc.  Am. Compl. ¶ 22.  Ms. Ryan is a naturalized U.S. citizen from Russia who has worked as a contractor for approximately nine years, including through a subcontract with Computer Technology Services, Inc.  Am. Compl. ¶ 23.  Mr. Nariman is a naturalized U.S. citizen from Iran who formerly worked as a contractor for approximately six years from 2007 to 2013.  Am. Compl. ¶ 24.  Mr. Peach is a U.S. citizen who has worked as a contractor for approximately eight years.  Am. Compl. ¶ 25.  As noted earlier, plaintiffs allege that approximately 660 potential class members served under similar contracts with the Board. Am. Compl. ¶ 9.

In 2013, the Department of State's Office of Inspector General ("OIG") conducted an audit of the Board's Office of Contracts "to evaluate whether [the Board] had adequate acquisition policies and procedures and to assess the efficacy of those policies and procedures." Pls.' Opp'n to Def.'s Mot. to Dismiss ("Pls.' Opp'n") Ex. A, at 1 (Audit of the Broadcasting Board of Governors Administration and Oversight of Acquisition Functions (June 2014) ("OIG Report")), ECF No. 15-2. As a result of its audit, OIG concluded that, among other things, the "[Board] awarded contracts that were personal in nature, resulting in [the Board] exceeding its statutory authority to award personal service[] contracts." *Id.* In its analysis, OIG used the definition of a personal service contract in 48 C.F.R. (Federal Acquisition Regulations, or "FAR") § 37.104(a), which states that such a contract "is characterized by the employer-employee relationship it creates between the [g]overnment and the contractor's personnel." *Id.* at 10. OIG looked to the following six factors outlined in FAR § 37.104(d) to assess whether certain Broadcasting Board contracts were personal service contracts:

(1) Performance on site.
(2) Principal tools and equipment furnished by the [g]overnment.
(3) Services are applied directly to the integral effort of agencies or an organizational subpart in furtherance of assigned function or mission.
(4) Comparable services, meeting comparable needs, are performed in the same or similar agencies using civil service personnel.
(5) The need for the type of service provided can reasonably be expected to last beyond one year.
(6) The inherent nature of the service, or the manner in which it is provided reasonably requires directly or indirectly, [g]overnment direction or supervision of contractor employees in order to –
   (i)   Adequately protect the [g]overnment's interest;
   (ii)  Retain control of the function involved; or
   (iii) Retain full personal responsibility for the function supported in a duly authorized [f]ederal officer or employee.

*Id.* at 10-11 (quoting FAR § 37.104(d)) (correcting typographical errors in the quotations as stated in the OIG report).

OIG noted that the FAR generally prohibits personal service contracts "without explicit statutory authority." OIG Report at 10 (citing FAR § 37.104(b)).[1] In terms of the Broadcasting Board's contracting efforts, the Foreign Relations Authorization Act, Fiscal Year 2003, Pub. L. No. 107-228, § 504, 116 Stat. 1350 (2002) (codified at 22 U.S.C. § 6206 note) established a pilot program in which the Director of the International Broadcasting Bureau (an office within the Broadcasting Board) is authorized to hire up to 60 "United States citizens or aliens" under

---

[1]The pertinent regulation states: "The [g]overnment is normally required to obtain its employees by direct hire under competitive appointment or other procedures required by the civil service laws. Obtaining personal services by contract, rather than by direct hire, circumvents those laws unless Congress has specifically authorized acquisition of the services by contract." FAR § 37.104(a).

-Appx19-

personal service contracts not to exceed two years in duration. *Id.* at 10 & n.13.[2]  OIG found that, "[b]ased on an estimate provided by an agency official," during the pertinent time (fiscal years 2011 and 2012), the Broadcasting Board "awarded approximately 660 services contracts that may have been personal in nature, 44 of which, according to [Board] officials, were appropriately classified as [personal service contracts]." *Id.* at 10; *see also id.* at 75 (defining the scope of OIG's analysis of the Board's domestic contracts).  OIG also performed its own analysis in which it "selected and reviewed 23 service[] contracts and found that 13 were labeled as nonpersonal service[] contracts, 5 were identified as [personal service contracts], 2 were identified both as a [personal service contract] and a nonpersonal service[] contract, and 3 had no indication of whether they were personal or nonpersonal service[] contracts." *Id.* at 11-12 (footnotes omitted).  Of the 16 contracts that were either identified as nonpersonal service contracts or not classified, OIG determined that at least 14 should have been classified as personal service contracts under the criteria in FAR § 37.104(d).  *Id.* at 12-14.  By extrapolating from this sample of contracts, OIG "concluded that [the Board] likely exceeded the statute's limit on the number of [personal service contracts] employed by awarding an overwhelming majority of all services contracts as nonpersonal service[] contracts, though they were personal in nature." *Id.* at 15.[3]

The Broadcasting Board disagreed with OIG's determination that it had exceeded its statutory authority, asserting that the contracts in question were not personal service contracts but rather "purchase order vendor" contracts, which are not subject to the same limitations.  OIG Report at 16-17; *see also id.* at 94-96 (Letter from Richard M. Lobo, Director, International Broadcasting Bureau, to Steve A. Linick, Inspector General, Department of State (Nov. 22, 2013)).  Nevertheless, the Board indicated that it would move away from entering into purchase order vendor contracts and instead use staffing agencies that would subcontract for the requisite services to alleviate the concerns raised in the OIG report.  OIG Report at 17.  The Board also stated that it would "reissue clear guidance to each manager about the distinction between independent contractors and personal service[] contractors." *Id.*

---

[2]Under the terms of the statute, this pilot program was to "terminate on December 31, 2005," and all contracts under the program were to remain in effect no longer than six months beyond this date.  22 U.S.C. § 6206 note, subsection (c).  According to the OIG report, "[t]his provision [of the authorization act] was extended each year via appropriations bills or continuing resolutions, keeping the authority in effect through September 30, 2014."  OIG Report at 11.  At the hearing held on August 16, 2016, the court was advised that this authorization remains in effect.  Hr'g Tr. 7:5-14 (Aug. 16, 2016) (The date will be omitted from further citations to the transcript of the hearing.).

[3]OIG also concluded that the Broadcasting Board did not comply with certain procedural requirements of the personal service contract pilot program, observing that some of the contracts exceeded two years in duration, and, in certain cases, the Director of the International Broadcasting Bureau did not directly approve the contract, nor did he or she make the required "determination that personnel resources were insufficient or that the need was not permanent."  OIG Report at 14-15 (citing 22 U.S.C. § 6206 note, subsection (b)).

Plaintiffs filed their original complaint on December 21, 2015, followed by an amended complaint on March 7, 2016.  Specifically, they allege that their contracts with the Broadcasting Board, as well as those of other potential class members, fall within the type of contracts that, according to the OIG's analysis, should have been classified as personal service contracts.  Am. Compl. ¶¶ 73-78.  Accordingly, plaintiffs allege that they are entitled to additional compensation and benefits – including rates of pay commensurate with the General Schedule rates applicable to federal employees, paid leave and holidays, retirement and insurance benefits, and certain tax-related benefits – that are provided to personal service contractors under internal Department of State rules and the rules of similar agencies.  Am. Compl. ¶¶ 85-93.  Plaintiffs advance two alternative claims that they are entitled to monetary relief: (1) that they are entitled to back pay and other monetary relief under the Back Pay Act and related statutes and regulations, Am. Compl. ¶¶ 94-98, 108-15; and (2) that they are entitled to monetary damages because the government has breached implied contracts with plaintiffs to compensate them in the same manner as contractors performing under actual personal service contracts, Am. Compl. ¶¶ 116-26.

## ANALYSIS

### A.  *Count One: Plaintiffs' Claim for Monetary Relief Under the Back Pay Act*

In its motion to dismiss, the government argues that Count One of plaintiffs' complaint should be dismissed for failure to state a claim upon which relief can be granted under RCFC 12(b)(6) because they have not alleged that they are or were "employees" of the federal government within the meaning of the Back Pay Act, 5 U.S.C. § 5596.  Def.'s Mot. at 7-8.  The Back Pay Act authorizes the payment of previously earned wages to "[a]n employee of an agency who, on the basis of a timely appeal or an administrative determination . . . is found by an appropriate authority under applicable law, rule, regulation, or collective bargaining agreement, to have been affected by an unjustified or unwarranted personnel action which has resulted in the withdrawal or reduction of all or part of the pay, allowances, or differentials of the employee."  5 U.S.C. § 5596(b)(1).  For the purposes of Title 5 of the United States Code, an "employee" is defined as "an individual who is . . . appointed in the civil service" by a federal employee acting in an official capacity.  5 U.S.C. § 2105(a)(1).  The government argues that although plaintiffs claim they were providing "personal services" to the government "in the manner of federal employees," *e.g.*, Am. Compl. ¶ 4, they do not allege they were ever actually appointed to the civil service, Def.'s Mot. at 7-8.  Therefore, the government asserts that plaintiffs have failed to state a cognizable claim under the provisions of the Back Pay Act.  *Id.*

The court agrees that Count One of plaintiffs' amended complaint must be dismissed, but for a more fundamental reason.  Before the court can consider whether plaintiffs have stated a claim upon which relief can be granted under RCFC 12(b)(6), the court "must first consider whether jurisdiction is proper."  *Herrmann v. United States*, 124 Fed. Cl. 56, 67 n.18 (2015) (citing *Greenlee Cnty. v. United States*, 487 F.3d 871, 876 (Fed. Cir. 2007); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed. Cir. 1988)); *see also Mendoza v. United States*, 87 Fed. Cl. 331, 335 (2009) ("Only after completing this initial jurisdictional inquiry will the court address the specific question of whether the facts in the plaintiffs' case [state a claim upon

which relief can be granted].").[4]  In this instance, plaintiffs invoke this court's jurisdiction under the Tucker Act, which grants the court "jurisdiction to render judgment upon any claim against the United States founded . . . upon the Constitution, or any Act of Congress or any regulation of an executive department." 28 U.S.C. § 1491(a)(1); *see also* Am. Compl. ¶ 17 (invoking this court's jurisdiction under the Tucker Act).  However, the Tucker Act alone cannot serve as a basis for this court's jurisdiction; a plaintiff also "must identify a separate source of substantive law that creates the right to money damages." *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (en banc in relevant part).  The Back Pay Act can serve as such a "money mandating" statute when it is invoked as a basis for monetary relief for "violations of [other] statutes or regulations covered by the Tucker Act." *Mendoza*, 87 Fed. Cl. at 335 (quoting *Worthington v. United States*, 168 F.3d 24, 26 (Fed. Cir. 1999)); *see also United States v. Connolly*, 716 F.2d 882, 887 (Fed. Cir. 1983) (en banc) (the Back Pay Act "is merely derivative in application," and therefore must be coupled with allegations of other violations of statutes or regulations within the purview of the Tucker Act).  Nonetheless, the Court of Federal Claims has jurisdiction under the Back Pay Act only for claims of "presently due money damages." *Todd v. United States*, 386 F.3d 1091, 1095 (Fed. Cir. 2004).  "[T]he long-standing rule [is] that 'one is not entitled to the benefit of a position until he has been duly appointed to it.'" *Id.* at 1095 (quoting *United States v. Testan*, 424 U.S. 392, 402 (1976)).  That rule applies "even though he may have performed the duties of another position or claims that he should have been placed in a higher grade." *Testan*, 424 U.S. at 406.  Without first obtaining the appointment, such a plaintiff has no claim for "presently due" money, and the court must dismiss the case for lack of jurisdiction. *Caraway v. United States*, 123 Fed. Cl. 527, 533 (2015) (citing *Todd*, 386 F.3d at 1095) (dismissing a case for lack of jurisdiction when plaintiffs alleged that they should have been promoted), *appeal pending*, No. 16-1322 (Fed. Cir.).

In connection with their Back Pay Act claim, plaintiffs allege that the Broadcasting Board violated numerous statutes, regulations, and internal agency rules pertaining to compensation for federal employees and contractors. Am. Compl. ¶¶ 85-93, 115 (citing various sections of Titles 5, 21, and 29 of the United States Code, which pertain to employee compensation and tax contributions, as well as sections of Titles 5 and 48 of the Code of Federal Regulations, which apply to federal employees and contractors, respectively).  In this connection, plaintiffs must make "a nonfrivolous assertion that [they are] within the class of plaintiffs entitled to recover under the money-mandating source." *Mendoza*, 87 Fed. Cl. at 335 (quoting *Jan's Helicopter Servs., Inc. v. Federal Aviation Admin.*, 525 F.3d 1299, 1307 (Fed. Cir. 2008)).  Because plaintiffs have invoked the Back Pay Act as the money-mandating statute, they must accordingly make a non-frivolous assertion that they fall within the class of individuals covered by the statute – in other words, "employees" defined under 5 U.S.C. § 2105(a) as individuals "appointed in the civil service." *See Greenlee Cnty.*, 487 F.3d at 877 (finding the Court of Federal Claims had

---

[4]In its motion to dismiss, the government did not challenge the court's subject matter jurisdiction over Count One of plaintiffs' complaint. *See* Def.'s Mot. at 5-6 (focusing its jurisdictional challenge under RCFC 12(b)(1) on Count Two of the complaint).  Nevertheless, "[s]ubject-matter jurisdiction may be challenged at any time by the parties or by the court *sua sponte*." *Folden v. United States*, 379 F.3d 1344, 1354 (Fed. Cir. 2004) (citing *Fanning, Phillips, Molnar v. West*, 160 F.3d 717, 720 (Fed. Cir. 1998) ("[The court] therefore ha[s] a special obligation to satisfy [itself] of [its] own jurisdiction.")).

subject matter jurisdiction because the plaintiff had established it was a "unit of local government" within the meaning of the money-mandating statute pertinent in that case, *i.e.*, the Payment in Lieu of Taxes Act). Here, the plaintiffs allege that they were "never" appointed, Am. Compl. ¶¶ 10, 102, but that they "should have been," Am. Comp. ¶ 14. Because the plaintiffs acknowledge that they were not appointed to the civil service, they cannot invoke jurisdiction under the Back Pay Act. *See Todd*, 386 F.3d at 1095.

The court is not persuaded by plaintiffs' citation to FAR § 37.104(a), which states that a "personal service[] contract is characterized by the employer-employee relationship it creates between the [g]overnment and the contractor's personnel," Am. Compl. ¶ 33, nor by their related assertion that they "were providing personal services in the manner of federal employees," Am. Compl. ¶ 25.[5] This is not the same as alleging that plaintiffs were in fact appointed to the civil service during the relevant time period. In responding to the government's motion to dismiss, plaintiffs concede that they were not appointed to the civil service, but they assert that the government's "argument ignores the most important fact of the case: the [Broadcasting Board] used illegal contracts fraught with material misrepresentations to lure [p]laintiffs and [m]embers of the proposed [c]lass into providing personal services without the appointments to federal service to which they were entitled." Pls.' Opp'n at 10.[6] Plaintiffs further assert that "[n]o

---

[5]In full, subsections (a) and (b) of FAR § 37.104 state:

    (a) A personal services contract is characterized by the employer-employee relationship it creates between the Government and the contractor's personnel. The Government is normally required to obtain its employees by direct hire under competitive appointment or other procedures required by the civil service laws. Obtaining personal services by contract, rather than by direct hire, circumvents those laws unless Congress has specifically authorized acquisition of the services by contract.

    (b) Agencies shall not award personal services contracts unless specifically authorized by statute (e.g., 5 U.S.C. 3109) to do so.

FAR § 37.104(a), (b).

[6]Plaintiffs also assert that OIG determined that the Broadcasting Board engaged in "fraud," and that the Board has conceded this fraud. *See, e.g.*, Am. Compl. ¶ 62 ("The [Board] admitted that it deliberately mis-labeled contracts as if providing non-personal services in knowing violation of law to avoid paying the compensation that was due to [p]laintiffs and [c]lass [m]embers as providers of personal services."); Pls.' Opp'n at 1 ("The Inspector General uncovered the agency-wide frauds in 2014 . . . . The [Board's] leadership ultimately admitted the essential facts of this case."); *id.* at 4 ("Since at least 2010, the [Board's] leadership has known that its contracting officers were fraudulently labeling contracts for 'non-personal services' . . . . Internally, the [Board] admitted that these findings were not only correct, but were applicable to almost its entire roster of 660 contractors."). The record is not so categorical, however. The OIG report does not state that the Board engaged in fraud; it postulates that the Board's contracting officials "did not know the difference between personal and nonpersonal service[] contracts," or "may not have been fully aware of or properly trained on the proper

[c]ourt has issued a published decision that denies applicability of the [Back Pay] Act when the lack of federal appointment is due solely to the agency's fraud against its workers." *Id.* at 11.

Even if these allegations of intentional error on the government's part are taken as true, plaintiffs have cited no authority to establish that "fraud" in a contract, or in the inducement to a contract, would serve to convert a contract employee to a civil service appointee for the purposes of claiming entitlement to monetary relief under the Back Pay Act. *See Costner v. United States*, 665 F.2d 1016, 1020 (Ct. Cl. 1981) (finding that even when a particular type of contract with the government was "not legally authorized," "there is no implication that the proper remedy is retroactively to make [the contractors] employees" for the purposes of a claim under the Back Pay Act); *see also id.* at 1021 (declining to apply common law to determine whether an employer-employee relationship existed, observing that the requirements of the Back Pay Act are more stringent).[7]  The situation might be different if plaintiffs were alleging that when they

_____

implementation and specific limitations of applicable statutes." OIG Report at 15. And, plaintiffs have not provided any evidence that the Board has conceded it committed fraud against its contractors. In its fifth and final response to the OIG report, the Board acknowledged that "it cannot employ personal services contractors in excess of those authorized," but stated that "the Agency continues to assert, as a legal matter, that its use of independent contractors is consistent with the FAR." OIG Report at 102.

[7]Plaintiffs assert that "on the same facts, the IRS and a U.S. district court entered three separate rulings that ignored the [Broadcasting Board's] fraudulent labeling of contracts and granted contractors certain statutory rights of appointed employment." Pls.' Opp'n at 10. As the "three separate rulings," plaintiffs cite (1) *Almutairi v. International Broad. Bureau*, 928 F. Supp. 2d 219 (D.D.C. 2013), (2) the internal Board memorandum from December 2013 in response to the OIG report, and (3) their own amended complaint at paragraph 72, which describes the *Almutairi* case. *Id.* Accordingly, plaintiffs only cite one "ruling[]," and they mischaracterize that decision, which, in any event, is inapplicable to the present case.

The *Almutairi* case does not address the question of whether alleged "fraudulent labeling of contracts" gives plaintiffs "statutory rights" to recovery under the Back Pay Act. That case involved a factual dispute over whether an individual (Mr. Almutairi) had applied for a civil service position or a purchase order vendor contract. *Almutairi*, 928 F. Supp. 2d at 226. After addressing this dispute, the district court examined whether Mr. Almutairi could still sue the government for discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII"), codified at 42 U.S.C. § 2000e *et seq.*, and the Rehabilitation Act of 1973, codified at 29 U.S.C. § 701 *et seq.*, even if he had only applied for a purchase order vendor contract. *Id.* at 229. The district court noted that both Title VII and the Rehabilitation Act allow discrimination suits by "employees or applicants for employment." *Id.* (citing 42 U.S.C. § 2000e-16 and 29 U.S.C. § 794a(a)(1)). Unlike the Back Pay Act, however, the remedies provided under Title VII and the Rehabilitation Act are not limited to civil service appointees; they apply to *all* employees and applicants for employment. *See, e.g.*, 42 U.S.C. § 2000e(f) (Title VII definition of an "employee" as "an individual employed by an employer"). Therefore, the district court's discussion of whether Mr. Almutairi qualified as an "employee" (or, more precisely, an "applicant for employment") for the purposes of his discrimination claim has no bearing on this

8

signed a contract with the government, they thought they were actually being appointed to the civil service because of misrepresentations by the government. But that is not the circumstance alleged in the complaint. Plaintiffs in essence assert that to procure the type of work they were performing, the Broadcasting Board *should* have entered into personal service contracts with them, or if that contract option was unavailable (for example, because the Board had already reached the statutory limit for such contracts), the Board *should* have appointed them to the civil service. Am. Compl. ¶¶ 4, 10; *see also* Am. Compl. ¶ 27 (noting that Broadcasting Board had the option of issuing up to 60 personal service contracts or appointing staff to the civil service). What the Board *should* have done is irrelevant to the question of whether plaintiffs can establish jurisdiction in this court under the Back Pay Act. *See Testan*, 424 U.S. at 407 (holding that appointment is a prerequisite even if the plaintiff claims he "*should have been* placed in a higher grade") (emphasis added)). The operative circumstance is that plaintiffs have not alleged, nor does it appear that they could non-frivolously allege, that they were *in fact* appointed to the civil service by the Board. Accordingly, Count One of plaintiffs' complaint must be dismissed for lack of subject matter jurisdiction.

Even if plaintiffs' Count One claim were to be interpreted as an implied assertion that they were "employees" within the definition of the Back Pay Act, that claim would have to be dismissed for failure to state a claim under RCFC 12(b)(6). Under the standards for a motion under RCFC 12(b)(6), the court must examine whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). As applicable here, "[t]he question of whether a government employee is serving by contract or appointment depends upon the 'relevant statutory language and regulations and the language of the hiring documents.'" *Calvin v. United States*, 63 Fed. Cl. 468, 472 (2005) (quoting *American Fed'n of Gov't Employees Local 1 v. Stone*, 342 F. Supp. 2d 619, 625 (N.D. Tex. 2004)). Plaintiffs have alleged that they were all serving under express contracts during the relevant time period, either directly with the Broadcasting Board or as subcontractors to a staffing agency holding a prime contract with the Board. Am. Compl. ¶¶ 22-25. As this court previously stated in *Calvin*, "[w]hile the Supreme Court has not explicitly held that employment by appointment and by contract are mutually exclusive, its reasoning implies such a principle, and courts have interpreted [*Army & Air Force Exchange Serv. v. Sheehan*, 456 U.S. 728

---

court's determination of whether a similar type of contractor would qualify as a civil service appointee under the Back Pay Act.

The internal Board memorandum is similarly inapposite. The cited portion of the memorandum discusses a 2010 IRS tax audit in which the IRS determined that the Board should have treated purchase order vendor contractors "as employees for tax reporting purposes, including by withholding income and Social Security taxes." Board Memorandum at 9. The Board cited the potential tax liability as a reason for using "external service provider[s]," *i.e.*, staffing agencies, to obtain purchase order vendor contractors instead of contracting with them directly. *Id.* at 9-10. The IRS's determination of whether purchase order vendor contractors should be treated as employees for tax purposes has little bearing on whether plaintiffs can be "employees" within the meaning of the Back Pay Act.

(1982),] and like precedents to require mutual exclusivity." 63 Fed. Cl. at 472 (citing *Collier v. United States*, 56 Fed. Cl. 354, 356-57 (2003)). Plaintiffs have provided no reason to disturb this principle that individuals serving under contract with the government cannot simultaneously be serving as appointees in the civil service.[8] Accordingly, they have not plausibly alleged that they were federal employees during the relevant time period. For the reasons stated, the government's motion to dismiss Count One of plaintiffs' amended complaint is GRANTED.

B. *Count Two: Plaintiffs' Claim for Monetary Damages for Breach of an Implied Contract*

   1. *Subject matter jurisdiction.*

   The government has moved to dismiss Count Two of plaintiffs' complaint for lack of subject matter jurisdiction. Def.'s Mot. at 5-7. The government asserts that plaintiffs' breach of contract claim is barred under the provisions of the CDA, specifically 41 U.S.C. § 7103(a), because it was not first submitted to and denied by a contracting officer. *Id.* The CDA "applies to any express or implied contract . . . made by an executive agency for . . . the procurement of services." 41 U.S.C. § 7102(a)(2). Under the Act's provisions, "[e]ach claim by a contractor against the [f]ederal [g]overnment relating to a contract shall be submitted to the contracting officer for a decision." 41 U.S.C. § 7103(a)(1). After such a claim has been made, "a contractor may bring an action directly on the claim in the United States Court of Federal Claims." 41 U.S.C. § 7104(b)(1). The government asserts that plaintiffs did not submit their breach of contract claim to a contracting officer, and this court consequently lacks jurisdiction to entertain the claim. Def.'s Mot. at 5-6 (citing *Advanced Materials, Inc. v. United States*, 46 Fed. Cl. 697, 701 (2000); *Witherington Constr. Corp. v. United States*, 45 Fed. Cl. 208, 211 (1999); *Cincinnati Elecs. Corp. v. United States*, 32 Fed. Cl. 496, 505 (1994)).

   As with Count One, the court agrees that Count Two must be dismissed for lack of subject matter jurisdiction, but for a different reason than that asserted by the government.[9] The

---

[8]If the court were to find that plaintiffs were serving as civil service appointees, this finding likely would be fatal to plaintiffs' breach of contract claim in Count Two. *See Calvin*, 63 Fed. Cl. at 473 ("In light of the evidence adduced by the parties, as well as the principle that 'federal employees do not have contractual relationships with the government, barring an explicit agreement to the contrary executed by a federal officer who has authority to contract,' *Darden v. United States*, 18 Cl. Ct. 855, 859 (1989), plaintiffs are appointees, and their claims of breach of employment contract are precluded.").

[9]Although the court finds there is a separate basis upon which to dismiss plaintiffs' allegations in Count Two, it notes that for at least two reasons, the provisions of the CDA requiring submission of a "claim" to the contracting officer before bringing a case before this court likely do not apply here. First, plaintiffs' alleged contracts with the Broadcasting Board do not appear to fall within the class of contracts intended to be covered under the CDA. As this court recently noted, "[t]he Federal Circuit has observed for many years that the CDA 'does not cover all government contracts.'" *Anchor Tank Lines, LLC v. United States*, __ Fed. Cl. __, __, 2016 WL 3910852, at *8 (2016) (quoting *Bailey v. United States*, 46 Fed. Cl. 187, 210 (2000) (in turn quoting *Coastal Corp. v. United States*, 713 F.2d 728, 730 (Fed. Cir. 1983))). "In particular,

10

_____

. . . the CDA does not apply to contracts that do not comport with the 'cost and competition' policy considerations underlying the CDA's enactment by Congress, and where applying the CDA would not 'do justice to the realities of the situation.'" *Id.* (quoting *Institut Pasteur v. United States*, 814 F.2d 624, 627 (Fed. Cir. 1987)). As discussed *infra* at 12 n.10, plaintiffs' *express* contracts with the Broadcasting Board constituted contracts with the government for the purposes of this court's jurisdiction under the Tucker Act. These contracts may be of the type intended to be covered by the CDA, although to a certain extent the Board's contracting procedures were largely "unencumbered by normal FAR clauses, constraints, and policies." *Bailey*, 46 Fed. Cl. at 211-12; *see also* OIG Report at 6, 30-31 (noting that the Board primarily awarded contracts pursuant to the simplified acquisition procedures in FAR §§ 13.000 to 13.501, using "quarterly sources sought notices" generally announcing opportunities for freelance talent, which resulted in "a solicitation process absent any competition"). Count Two, however, is not based on these express contracts, but rather on implied contracts with the government that purportedly included additional compensation terms. Although the government correctly notes that the provisions of the CDA apply to implied contracts as well as express contracts, Def.'s Mot. at 7, the implied contracts in question must still comport with the additional standards described in *Institut Pasteur* and related precedents. Here, plaintiffs have specifically alleged that these implied contracts were not the result of a normal government procurement efforts, but rather arose because plaintiffs were providing services that would typically have been compensated in a different manner. *See* Am. Compl. ¶ 121. Accordingly, and assuming *arguendo* that the court found a basis for such implied contracts to exist, which it does not, these contracts would not "comport with the cost and competition policy considerations underlying the CDA's enactment." *Anchor Tank*, __ Fed. Cl. at __, 2016 WL 3910852, at *8 (internal quotation marks omitted).

Second, the "claim" at issue in Count Two of plaintiffs' complaint does not appear to be the type of claim contemplated by the CDA in terms of its requirements for submission to a contracting officer. The CDA does not separately define a "claim," but the FAR defines a claim as a "written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to the contract." 48 C.F.R. § 2.101. Again, plaintiffs are not seeking monetary relief arising from their express contracts with the Broadcasting Board, nor are they asking for "adjustment or interpretation" of those contracts' terms. Rather, they are alleging that the government has breached a different set of compensation terms derived from implied contracts. As evidenced by plaintiffs' complaint, these are not claims for a "sum certain," but rather a yet-to-be-determined amount roughly equivalent to the compensation that would have been given to a federal employee doing the same type of work during the same time period. *See* Am. Compl. ¶¶ 122-23. Plaintiffs further complicate the issue by alleging that the implied contracts arose as a result of the government's "fraud" or misrepresentation in mislabeling the express contracts as ones for "nonpersonal services." Pls.' Opp'n at 11-17. Without addressing whether the type of fraud alleged by plaintiffs constitutes an exception to the CDA under 41 U.S.C. § 7103(c)(1), the court finds that it would likely not "do justice to the realities of the situation" to require plaintiffs to submit the type of claim alleged in Count Two to a contracting officer before bringing a suit in this court. *Institut Pasteur*, 814 F.2d at 627.

court recently noted that "[t]he general rule is that so long as the plaintiffs have made a non-frivolous claim that they are 'entitled to money from the United States' . . . because they have a contract right, this court has jurisdiction to settle the dispute." *Anchor Tank*, __ Fed. Cl. at __, 2016 WL 3910852, at *7 (quoting *Adarbe v. United States*, 58 Fed. Cl. 707, 714 (2003) (in turn quoting *Ralston Steel Corp. v. United States*, 340 F.2d 663, 667 (Ct. Cl. 1965))); *see also City of Cincinnati v. United States*, 153 F.3d 1375, 1377 (Fed. Cir. 1998) (holding that a "non-frivolous assertion of an implied contract with the United States" is sufficient to establish subject matter jurisdiction in this court). The four named plaintiffs allege that they worked for the Broadcasting Board under "independent contracts," including "purchase orders" or orders under "blanket purchase agreements," and that approximately one year ago, two of the four plaintiffs (Mr. Lee and Ms. Ryan) began providing services through subcontracts with staffing agencies retained by the Board. Am. Compl. ¶¶ 22-25.[10]  Plaintiffs' claim in Count Two, however, is not based on an entitlement to money damages under these express contracts. Instead, plaintiffs allege they also had implied-in-fact contracts with the government that entitled them to additional "benefits, tax payments, wages or salaries, and other consideration." Am. Compl. ¶ 121.

Plaintiffs have failed to make a non-frivolous claim of an implied-in-fact contract with the government above and beyond the provisions of their express contracts. "The existence of an express contract precludes the existence of an implied contract dealing with the same subject, unless the implied contract is entirely unrelated to the express contract." *Atlas Corp. v. United States*, 895 F.2d 745, 754-56 (Fed. Cir. 1990) (finding that plaintiffs were not entitled to additional payments to cover the costs of tailings stabilization because those costs were not "'entirely unrelated' to the costs included in the contract prices," and affirming dismissal for lack of jurisdiction); *see also Algonac Mfg. Co. v. United States*, 428 F.2d 1241, 1255 (Ct. Cl. 1970) ("[A]s a general rule there can be no implied contract where there is an express contract between the parties covering the same subject."); *Cummings v. United States*, 17 Cl. Ct. 475, 480 n.8 (1989) (quoting *Algonac Mfg.* and disposing of plaintiff's claim of an implied contract without further comment because plaintiff had already alleged a written contract on the same subject); *Trauma Serv. Grp., Ltd. v. United States*, 33 Fed. Cl. 426, 432 (1995) (also citing *Algonac Mfg.*), *aff'd*, 104 F.3d 1321 (Fed. Cir. 1997). Here, plaintiffs do not allege that their entitlement to additional compensation is based on work done outside the scope of their express contracts. Rather, they argue that their express contracts *should* have been styled as personal service contracts, in which case plaintiffs would have been entitled to compensation in the same manner

---

[10]The court does not doubt that the plaintiffs, as direct contractors and not subcontractors, worked under express contracts with the government for the purposes of the court's jurisdiction under the Tucker Act. *See DaVita, Inc. v. United States*, 110 Fed. Cl. 71, 81 (2013) ("A purchase order 'is an offer by the government to the supplier to buy certain supplies or services upon specific conditions. A contract is established when the supplier accepts the order, by furnishing the supplies or services ordered or by . . . substantial performance prior to the due date.'" (quoting *Canal 66 P'ship v. United States*, 87 Fed. Cl. 722, 726 (2009) (in turn quoting *Zhengxing v. United States*, 71 Fed. Cl. 732, 738 n.21 (2006)), *aff'd*, 204 Fed. Appx. 885 (Fed. Cir. 2006) (alteration in *Canal 66 P'ship*)). The pertinent question, however, is whether plaintiffs have made a non-frivolous claim of entitlement to money damages under an *implied* contract with the government beyond the terms of their *express* contracts.

as federal employees.  Am. Compl. ¶¶ 118-24.  Plaintiffs do not allege that the government actually offered to provide them additional compensation, or that they were pressed into providing services beyond what was contemplated in their express contracts, thus entitling them to additional compensation.  Such allegations might form the basis for an implied contract "entirely unrelated" to the terms of the express contracts already held by the plaintiffs.  *Atlas Corp.*, 895 F.2d at 754.  Absent these or similar allegations, however, the court lacks jurisdiction to consider a claim that an implied contract has been breached when there is no basis on which such an implied contract could be established.

Alternatively, plaintiffs argue that under the theory of *quantum meruit* ("as much as he merited"), the government received the benefit of "personal services" performed by the plaintiffs without providing the compensation that would typically be provided to personal services contractors.  Am. Compl. ¶ 126; *see also United States v. Amdahl Corp.*, 786 F.2d 387, 393 n.6 (Fed. Cir. 1986) (defining "quantum meruit").  This contention is premised on accepting the postulate that plaintiffs' individual contracts were void because the Broadcasting Board entered the contracts in contravention of FAR § 37.104.  The court also lacks jurisdiction to consider this argument.   "A recovery in quantum meruit is based on an implied in-law contract.  That is, a contract in which there is no actual agreement between the parties, but the law imposes a duty in order to prevent injustice."  *International Data Prods. Corp. v. United States*, 492 F.3d 1317, 1325 (Fed. Cir. 2007).  The Court of Federal Claims generally does not have jurisdiction over *quantum meruit* or implied-in-law contract claims.  *Id.*; *see also Trauma Serv. Grp.*, 33 Fed. Cl. at 432 ("Claims for unjust enrichment on quantum meruit damages state claims for breaches of contracts implied in law, over which the court has no jurisdiction." (citing *United States v. Mitchell,* 463 U.S. 206, 218 (1983); *United States v. Minnesota Mutual Co. Inc.,* 271 U.S. 212, 217 (1926); *Atlas Corp.*, 895 F.2d at 755)).[11]  The Federal Circuit has found an exception to this general jurisdictional rule and allowed recovery under a *quantum meruit* or *quantum valebant* ("as much as it was worth") theory when a contractor provided goods or services to the government in good faith under an express contract, but that contract was later rescinded for invalidity.  *See Amdahl*, 786 F.2d at 393; *see also International Data Prods.*, 492 F.3d at 1325-26 (acknowledging the exception in *Amdahl* but finding it was inapplicable because the contract in question was "neither invalid nor unenforceable"); *United Pac. Ins. Co. v. United States*, 464 F.3d 1325, 1329-34 (Fed. Cir. 2006) (concluding that the exception in *Amdahl* was inapplicable because the plaintiffs were paid "the full amount required by the contract").  In this instance, the exception in *Amdahl* is not applicable to plaintiffs' claim because the express contracts with plaintiffs have not been found to be invalid, and plaintiffs have not alleged that they were not paid in full under the express terms of those contracts.[12]  Accordingly, this court does not have jurisdiction over plaintiffs' *quantum meruit* claim.

---

[11]This jurisdictional bar is based in part on the principle that no contract with the government can arise without affirmative action by a contracting officer with the authority to bind the government.  *See Trauma Serv. Grp.*, 33 Fed. Cl. at 431-32 (citing *Merritt v. United States,* 267 U.S. 338, 341 (1925)).

[12]At the hearing, plaintiffs raised for the first time the argument that their express contracts with the Broadcasting Board might have been void *ab initio* due to fraud, misrepresentation, or other defects, and that this could be an additional basis for their *quantum*

13

2. *Failure to state a claim upon which relief can be granted.*

Even if this court had jurisdiction over plaintiffs' breach of contract claim in Count Two, this claim would have to be dismissed under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. As discussed *supra*, a motion under RCFC 12(b)(6) requires the court to examine whether there is sufficient factual matter in the complaint to establish a "claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 570. The government's motion to dismiss plaintiffs' complaint cites both RCFC 12(b)(1) and 12(b)(6). Def.'s Mot. at 1. Although the government focused its breach of contract arguments on jurisdictional issues, the court may nonetheless also consider whether, under the standards applicable to RCFC 12(b)(6), plaintiffs' complaint states a plausible claim to relief.[13] In *Trauma Serv. Grp.*, 104 F.3d at 1324-27, the court of appeals concluded that plaintiff's allegations of an express or implied contract with the government were sufficient to establish jurisdiction in the Court of Federal Claims, but it nevertheless affirmed the trial court's decision to dismiss the complaint under RCFC 12(b)(6) because neither an express nor an implied contract could have existed as a matter of law.

Although plaintiffs frame their claim in Count Two as a breach of an *implied* contract, it could alternatively be viewed as an allegation that certain terms involving compensation were omitted from their *express* contracts with the government. In that case, plaintiffs would be

---

*meruit* claim. Hr'g Tr. 26:23-25, 33:8-15. The government responded preliminarily at the hearing, and, in a notice filed after the hearing at the court's request, the government noted that under the rationale in *American Tel. & Tel. Co. v. United States*, 177 F.3d 1368, 1373-74 (Fed. Cir. 1999), plaintiffs' contracts would not necessarily be void because of fraud or other contravention of statute or regulation, and that the court must look instead to the purpose of the pertinent statute or regulation that was allegedly violated. Def.'s Notice of Authority at 2, ECF No. 22; *see also American Tel. & Tel.*, 177 F.3d at 1374 (recognizing "the strong policy of supporting the integrity of contracts made by and with the United States"). It is not necessary for the court to address plaintiffs' further merits-based argument, however, because it does not fit within the jurisdictional exception contained in *Amdahl*. As was the case in *United Pacific Insurance*, 464 F.3d at 1329-34, plaintiffs here have already been paid in full for contracts spanning as far back as 2003, Hr'g Tr. 23:8-13; Am. Compl. ¶¶ 22-25. Accordingly, and even if plaintiffs now wish to contend that these contracts are void, the court has no basis on which to take jurisdiction over plaintiffs' *quantum meruit* claim.

[13]Plaintiffs advanced detailed arguments at the hearing as to why their breach of contract count states a claim, *see* Hr'g Tr. 23:14 to 28:7, 32:23 to 35:4, 48:19 to 50:17, and 55:9 to 56:1, and the government responded to those arguments, *see* Hr'g Tr. 42:10 to 44:7. Plaintiffs elaborated on this oral submission with a supplemental brief addressing the government's arguments that no viable claims had been stated in Count Two. *See* Pls.' Resp. to Def.'s Notice of Authority, ECF No. 24. In these circumstances, the court may consider whether the pertinent count of the complaint states a claim. *See Anaheim Gardens v. United States*, 444 F.3d 1309, 1315 (Fed. Cir. 2006) ("The trial court may dismiss *sua sponte* under Rule 12(b)(6), provided that the pleadings sufficiently evince a basis for that action."); *see also Shockley v. Jones*, 823 F.2d 1068, 1072-73 & n.3 (7th Cir. 1987) (stating that a *sua sponte* dismissal under Rule 12(b)(6) can be appropriate when plaintiff had notice and an opportunity to be heard).

-Appx30-

asking the court to insert implied *terms* to fill the gap left by this omission. Even under this lenient reading of the complaint, plaintiffs have not plausibly alleged their express contracts with the government omitted any essential terms. "It is not the habit of courts to resolve disputes over omission concerning [contract] matters by resorting to implied terms." E. Allan Farnsworth, *Disputes Over Omission in Contracts*, 68 Colum. L. Rev. 860, 862 (1968) (advocating resolution of omissions through inferences from the actual contract terms, or "basic principles of fairness or justice," *id.* at 877, rather than by inserting implied terms based on the parties' presumed intentions). An omission, or a "*casus omissus*" ("case which is not provided for"), generally occurs where there is an event not accounted for in the express language of the contract and not anticipated by the parties. *Id.* at 862 n.11, 873-76 (quoting 1 J. Bouvier, *Law Dictionary* 431 (8th ed. 1914)); *see also Restatement (Second) Contracts* § 204 cmt. b (1981) ("*How omission occurs*. The parties to an agreement may entirely fail to foresee the situation which later arises and gives rise to a dispute; they then have no expectations with respect to that situation."). If an omitted term is "essential," *i.e.*, it is necessary to the determination of the parties' rights under the contract, a court may fill this gap with "a term [that] is reasonable in the circumstances." *Restatement (Second) Contracts* § 204; *see also Pacific Gas & Elec. Co. v. United States*, 536 F.3d 1282, 1289 (Fed. Cir. 2008) (stating that the court can supply a minimum acceptance rate in a contract for storage of spent nuclear fuel because without that term, "the contract would be meaningless and nonsensical"); *Howell v. United States*, 51 Fed. Cl. 516, 520-21 (2002) (court may supply a minimum quantity term to an indefinite-quantity contract when the parties failed to include that term).

Here, plaintiffs have not demonstrated that additional compensation terms were "essential" to their contracts.[14] Again, nothing in plaintiffs' complaint suggests that anything

---

[14] In their amended complaint, plaintiffs assert that their express contracts with the Broadcasting Board were required to contain the clause set out in FAR § 52.232-3, which pertains to personal service contracts and states:

> The Government shall pay the Contractor for the services performed by the Contractor, as set forth in the Schedule of this contract, at the rates prescribed, upon the submission by the Contractor of proper invoices or time statements to the office or officer designated and at the time provided for in this contract. The Government shall also pay the Contractor (a) a per diem rate in lieu of subsistence for each day the Contractor is in a travel status away from home or regular place of employment in accordance with Federal Travel Regulations (41 CFR [§] 101-7) as authorized in appropriate Travel Orders; and (b) any other transportation expenses if provided for in the Schedule.

Am. Compl. ¶ 86 (quoting FAR § 52-232-3 in part). Plaintiffs argue that the reference to "rates prescribed" in this clause refers to rates prescribed for federal employees under Title 5 of the Code of Federal Regulations, as well as by internal agency rules. Am. Compl. ¶¶ 87-91; *see also* Hr'g Tr. 35:16 to 37:11. Plaintiffs concede that the Broadcasting Board has no such rules prescribing certain rates of pay or benefits for personal service contracts, Am. Compl. ¶ 87-88, but nevertheless assert that the wages and benefits prescribed in the rules of the Board's "sister and parent agencies," namely, the United States Agency for International Development and the

changed with regard to the nature of their work under the contracts or the government's representations about how plaintiffs would be compensated. The only difference appears to be the OIG's report finding that the Broadcasting Board issued certain "nonpersonal service[]" contracts that should have been identified and structured as "personal service[]" contracts. The court cannot, however, use those findings as a basis to substitute or supplement compensation terms in plaintiffs' prior contracts with the Board with "implied" terms entitling plaintiffs to the type of compensation they would have preferred to receive. Count Two of plaintiffs' amended complaint is unavailing.

_____

Department of State, should be substituted in the absence of such rules for the Board, Am. Compl. ¶¶ 89-91.

The contract clause contained in FAR § 52.232-3 falls within a group of sections (FAR §§ 52.232-1 to -10) that pertain to "invoice payments" made under fixed-price contracts. *See* 2 Karen L. Manos, *Government Contract Costs & Pricing* § 85:8 (June 2016 ed.). Similar provisions for payments under fixed-price contracts generally (FAR § 52.232-1) and payments under fixed-price research and development contracts (FAR § 52-232-2) substitute the phrase "rates prescribed" for "the prices stipulated in [the] contract." The use of "rates prescribed" in FAR § 52.232-3 is preceded by the phrase "as set forth in the Schedule of this contract," which indicates that the clause refers to the rates prescribed in the contract's schedule, as well as to the "services performed" under that schedule. Accordingly, addition of this clause to plaintiffs' express contracts with the Broadcasting Board would not entitle plaintiffs to any wages or benefits beyond those already specified in the contract. In this same vein, FAR § 52.232-3 refers to entitlement to "per diem" rates related to travel, but plaintiffs have not alleged that their express contracts omitted such entitlements. Plaintiffs list a total of 22 types of pay and benefits they believe they were denied under their express contracts, but none of them involves reimbursement for travel-related expenses. Am. Compl. ¶¶ 85, 115, 122.

At the hearing, plaintiffs also elaborated the argument that certain statutes and regulations other than the FAR compelled the inclusion of additional terms related to compensation and benefits in plaintiffs' express contracts with the Broadcasting Board. Hr'g Tr. 35:13 to 37:11. Although plaintiffs did not enumerate these provisions at the hearing, they referred to a list in their amended complaint, Am. Compl. ¶¶ 85, 115, which included certain statutes and regulations to be used as "proxies for determining reasonable compensation" allegedly owed to plaintiffs. Am. Compl. ¶ 85. The court finds that the cited authorities are inapplicable to plaintiffs even if, as they allege, they should have been compensated as personal service contractors. For example, plaintiffs cite various provisions of Title 5 of the United States Code related to basic rates of pay, premium pay, paid leave and holidays, compensation for work-related injuries, and various retirement, health, and insurance benefits. Am. Compl. ¶ 85. However, the same definition for "employee" that applies to the Back Pay Act applies to all other provisions of Title 5, *i.e.*, the provisions only apply to individuals "appointed in the civil service." 5 U.S.C. § 2105. The same is true for the regulations plaintiffs cite within Title 5 of the Code of Federal Regulations (*e.g.*, 5 C.F.R. Parts 304 and 511), which tellingly all fall within Subchapter B entitled "Civil Service Regulations." Am. Compl. ¶ 85. Accordingly, the cited statutes and regulations do not require that any additional terms be included in plaintiffs' express contracts with the Broadcasting Board.

**CONCLUSION**

For the reasons stated, the government's motion to dismiss plaintiffs' complaint under RCFC 12(b)(1) and 12(b)(6) is GRANTED.[15]  The clerk will enter judgment in accord with this disposition.

No costs.

It is so **ORDERED**.

s/ Charles F. Lettow
Charles F. Lettow
Judge

---

[15]Plaintiffs' motion to certify a class of similarly situated contractors is DENIED as moot, as is plaintiffs' motion for an extension of time to file a reply in support of their motion to certify a class.

17

**-Appx33-**

# In the United States Court of Federal Claims

## No. 15-1555 C

**SEH AHN LEE, et al.,**

          **JUDGMENT**

   **v.**

**THE UNITED STATES**

     Pursuant to the court's Opinion and Order, filed August 24, 2016, granting defendant's motion to dismiss,

     IT IS ORDERED AND ADJUDGED this date, pursuant to Rule 58, that plaintiff's complaint is dismissed.  No costs.

                      Lisa L. Reyes
                      Acting Clerk of Court

**August 25, 2016**         By:   s/Anthony Curry

                      Deputy Clerk

NOTE: As to appeal, 60 days from this date, see RCFC 58.1, re number of copies and listing of all plaintiffs.  Filing fee is $505.00.